989 So.2d 1094 (2007)
H.H.
v.
BALDWIN COUNTY DEPARTMENT OF HUMAN RESOURCES.
2060521.
Court of Civil Appeals of Alabama.
October 5, 2007.
Opinion on Return to Remand March 14, 2008.
*1096 P. David Matheny, Bay Minette, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Elizabeth L. Hendrix, asst. attys. gen., Department of Human Resources, for appellee.
MOORE, Judge.
This is a termination-of-parental-rights case. H.H. ("the mother") appeals from a judgment entered on January 17, 2007, by the Baldwin Juvenile Court, terminating her parental rights to A.O. ("the child").[1] We reverse and remand.
The mother appeals on two grounds. The mother first contends that the Baldwin County Department of Human Resources ("DHR") failed to use reasonable efforts to reunite the child with her. The mother next argues that the juvenile court failed to consider other alternatives to termination of her parental rights. Because we find the resolution of the first issue to be dispositive of the case, we do not address the second issue.
DHR contends that it had no duty to use reasonable efforts to reunite the mother with the child because, it says, the mother abandoned the child. See Ala. Code 1975, § 26-18-7(a)(1); Ala.Code 1975, § 12-15-65(m)(1) ("[r]easonable efforts [to reunite a parent with a child] shall not be required to be made ... where a court of competent jurisdiction has determined *1097 that a parent has ... [s]ubjected the child to an aggravated circumstance, including, but not limited to, abandonment"); and 42 U.S.C., § 671(a)(15)(D).[2]
Although we agree with the general proposition that reasonable efforts to reunite a parent with a child are not required when a parent has abandoned the child, we note that the juvenile court in this case did not make any finding that the mother had abandoned the child. In fact, the juvenile court found that DHR had used reasonable efforts to reunite the child with the mother, a finding that is inconsistent with any conclusion that the mother had abandoned the child. See S.A.B. v. Mobile County Dep't of Human Res., 845 So.2d 825 (Ala.Civ.App.2002).
In this case, the evidence shows that DHR picked up the child on January 11, 2005, when a nonrelative individual contacted DHR to report that the mother had left the child in that individual's care without proper medication. Thereafter, the mother initially visited with the child; however, the mother did not visit the child at all between November 2005 and April 2006, and she visited the child only twice between April 2006 and October 2006, before resuming regular weekly visitation. The mother did not support the child at all after DHR obtained custody of the child in April 2005. As in S.A.B., such evidence could support a finding that the mother abandoned the child, either at the time DHR first picked up the child or later when the mother ceased visiting the child and supporting the child. However, the inconsistent finding by the juvenile court that DHR used reasonable efforts to reunify the child with the mother prevents this court from assuming that the juvenile court made a finding of abandonment.
In S.A.B., this court remanded the case for the juvenile court to determine whether the parent had abandoned the child, a possibility that the juvenile court apparently overlooked. If so, this court held, the juvenile court did not need to determine whether DHR had used reasonable efforts to reunite the parent with the child; if not, this court held, the juvenile court was required to determine whether DHR had used reasonable efforts to reunite the parent and the child.
Based on the similarities between the facts in this case and the facts in S.A.B., as well as the nearly identical arguments asserted by DHR, we hold that the judgment in this case should also be remanded for the juvenile court to make a specific finding as to whether and, if so, when, the mother abandoned the child. If the juvenile court determines, based on clear and convincing evidence, that the mother abandoned the child before DHR obtained custody, it should specify that DHR had no duty to use reasonable efforts to reunite the mother with the child. If the juvenile court finds that the mother abandoned the child when she ceased visitation and support, the juvenile court should determine whether DHR engaged in reasonable efforts to reunite the child with the mother *1098 before the mother's abandonment. If the juvenile court finds that the mother did not abandon the child at any time, the juvenile court should make a determination as to the reasonableness of DHR's efforts to reunite the mother with the child. The juvenile court shall make a return to remand within 28 days of the release of this opinion.
REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

On Return to Remand
MOORE, Judge.
This is a termination-of-parental-rights case. H.H. ("the mother") appeals from a judgment entered on January 17, 2007, by the Baldwin Juvenile Court, terminating her parental rights to A.O. ("the child").[1] We reverse and remand.

Facts
The testimony and evidence presented at the termination hearing on January 8, 2007, indicated the following. The child was born on February 2, 1998, to the mother and J.O. ("the father"). The record is unclear as to whether the mother and the father were married at the time. The father testified that a court had awarded custody of the child to the mother and had ordered him to pay child support. The father also testified that he had obtained custody for three or four months pursuant to a pendente lite order but that the court had later transferred custody back to the mother. The father recalled that he had paid child support through a payroll deduction of less than $200 per month between the years 2000 and 2005.
The mother testified that before the Baldwin County Department of Human Resources ("DHR") became involved in this matter on January 11, 2005, she had been rearing the child. Before DHR's involvement, she had developed a relationship with K.H., her boyfriend, and she and the child had lived with K.H. at K.H.'s mother's house. In early 2005, the mother, the child, and K.H. lived in a tin building behind K.H.'s mother's house that the parties referred to as "the shed." The shed had no running water and no insulation; it received electricity via a cord running from K.H.'s mother's house, which was used to power a small refrigerator, a heater, and an air-conditioning window unit, and it contained a bedside chamber pot. The mother and her boyfriend slept in the same room with the child. The DHR representative responsible for overseeing the mother's case testified at the termination hearing that the mother had told her that the child had slept on a mattress with his head resting at the foot of the chamber pot. The DHR representative indicated that the mother and the child appeared to have been living in destitute poverty, but the mother considered this living arrangement to be appropriate.
Before DHR's involvement, the mother had made sure that the child attended school. When she could not get him to school, she had depended on K.H.'s mother to take the child to school. The child was an A/B student in kindergarten and in first grade.
The mother twice left the child with other individuals when she could not properly care for the child. On January 11, 2005, DHR received a report indicating that the mother had left the child with a nonrelative without leaving appropriate *1099 medication for the child's alleged seizure disorder.[2] The DHR representative testified that she did not know who that nonrelative was or how long that individual had been caring for the child when DHR received the report.
DHR obtained custody of the child and placed him with his maternal grandparents. The child stayed in the home of his maternal grandparents from January 14, 2005, to April 20, 2005, when they informed DHR that they could no longer care for him. DHR made no effort to reunify the child with the mother during that period.
The juvenile court awarded custody of the child to DHR on April 20, 2005, and it granted DHR the discretion to place the child. At that point, DHR considered returning the child to the mother, but she had recently severely burned her wrist and was unable to care for the child. DHR therefore placed the child with a foster-care family. The child has been in foster care since April 20, 2005.
When DHR obtained custody of the child, the child was diagnosed with attention deficit/hyperactivity disorder. The child was not missing any necessary medications, as had been alleged at the time DHR took the child into custody in January 2005. The child was at an appropriate weight for his age, and it appeared that he had been receiving proper care. All of his medical needs had been met, except that he needed ear plugs for his ears. His ear condition was not the result of neglect.
After obtaining custody of the child, DHR held various Individual Service Plan ("ISP") meetings. It appears that the first ISP meeting occurred in June 2005. At that time, DHR informed the mother that in order to be considered for reunification with the child she would have to submit to random drug testing, obtain suitable housing, obtain and maintain stable employment, and consistently visit the child once every two weeks. In addition, the DHR representative expressed concern at the ISP meeting over the mother's relationship with K.H.[3] At that time, K.H. was involved with drugs, and, according to the testimony of the DHR representative, K.H. had been arrested 13 times for drug-related crimes, domestic violence, and reckless driving,[4] all crimes not directly involving children.
The mother tested positive for cocaine and marijuana in her initial drug test on June 13, 2005. The DHR representative initially testified that the mother had admitted to using those drugs. Later, however, the DHR representative testified that the mother had claimed that someone must have slipped a substance into her drink. Based on that positive drug test, DHR requested that the mother submit to hair-follicle drug testing to determine whether the mother was using other drugs and whether the mother had been using cocaine and marijuana for a long period of time. The mother never took a hair-follicle drug test. Despite the June 13, 2005, positive drug test, and the identification of drug use as a barrier to reunification, the DHR representative testified at the termination hearing that she had not discussed, and had not even considered discussing, *1100 with the mother any options for drug treatment or rehabilitation.
The mother did not submit to "about five" random drug tests requested by DHR. When the DHR representative would telephone her to schedule the testing, the mother would always have some excuse as to why she could not attend.
The mother did submit to drug testing a second time on April 10, 2006, and she again tested positive for cocaine. After that positive drug test, the mother complained that she lacked transportation to attend further testing. On April 12, 2006, the DHR representative arranged to provide the mother bus tickets to the testing site. The mother failed to show up to get the tickets. The mother testified that she did not have transportation to meet the DHR representative to obtain the tickets.
The mother testified that after her second positive drug test, she was able to "kick" her drug habit with the help of K.H.'s mother. At the termination hearing, the mother testified that she had been drug-free for two years. After DHR's attorney pointed out that her last positive drug test had been within that period, the mother corrected herself and testified that she had quit consistently using drugs before her last positive drug test and that she had stopped using drugs altogether afterwards. The mother offered to submit to drug testing in November 2006, but DHR rejected the offer because the mother appeared to be out of breath. The mother tested negative on a drug test conducted on January 8, 2007, the date of the termination hearing.
Although DHR had requested at the initial June 2005 ISP meeting that the mother obtain suitable housing, the mother continued to reside in the shed for the next year. She subsequently moved out of the shed and lived at an unknown residence in Pensacola, Florida, for an unspecified period. At the time of the termination hearing, the mother was residing in a loft in K.H.'s mother's house. The loft consisted of a single open area with a bedroom and a living room. The bedroom contained two single beds. The mother accessed the loft via a steep, attic-type ladder. The mother indicated that K.H. slept with her. Besides K.H., K.H.'s mother, and the mother, several other persons resided in the house. The DHR representative never discussed the appropriateness of this living arrangement with the mother, but the DHR representative testified at the termination hearing that she could not approve the mother's living arrangement as being suitable for the child.
DHR did not offer the mother any services to locate suitable housing, such as through the federal "Section 8" program. The DHR representative testified that she had thought that DHR's assistance was not necessary because, she said, the mother had indicated that she was looking for adequate housing. The mother testified that relatives had located low-income housing in her area via the Internet in October 2006. The mother testified that when she learned of this housing possibility, she signed up to obtain a two-bedroom apartment. At the time of the termination hearing, the mother was on a waiting list for the apartment.
The mother was not employed at the time DHR obtained custody of the child in January 2005. She had applied for Supplemental Security Income benefits, but her application had been denied. The mother eventually obtained a job at a Waffle House restaurant. She earned $4,000 between January 2006 and May 2006, but she had quit that job because of health problems.
In the fall of 2006, the mother was diagnosed with polycystic kidney disease. The *1101 mother testified that she had developed painful tumors throughout her inner lower-abdominal region. This condition, along with the mother's wrist injury and a staph infection in one of her arms, resulted in the mother's being hospitalized on four or five occasions in the year and a half before the January 8, 2007, termination hearing. The DHR representative testified that in December 2006 she had contacted the mother's physician, who had verified that the mother's condition prevented her from being able to care for others at that time. According to the DHR representative, the physician also expressed concern that the mother might have been addicted to prescription medication that she was taking for the condition. The mother testified at the termination hearing that she was still taking that medication.
The mother testified that her medical condition is painful and that it prevents her from working a permanent job. Despite her condition, the mother eventually went to work for K.H.'s mother. The mother assists K.H.'s mother in caring for elderly persons who reside in K.H.'s mother's house. The DHR representative asked the mother to verify her employment and income, but the mother failed to comply with that request. At the termination hearing, the mother testified that she was receiving $300 per month plus room and board. The mother testified that $100 of that amount was used to help pay the electricity bill and that she retained the rest.
DHR did not offer the mother any services to increase her independence. DHR did not gather any information as to the mother's educational or intellectual achievement. DHR did not consider referring the mother to the displaced-homemaker program. DHR did not assist the mother with locating suitable employment.
Although DHR had expressed concerns about K.H., the mother still resided with him at the time of the termination hearing. The mother had told the DHR representative in September 2006 that she wanted to marry K.H. within the next three months. The mother had not married K.H. by the time of the termination hearing, however, and she indicated at the hearing that she would terminate the relationship with K.H. if that would enable her to regain custody of the child.
The mother visited the child during the first few months that he was in foster care. However, the mother did not visit the child at all between November 2005 and April 2006. The mother visited the child twice between April 2006 and July 2006. Since October 2006, the mother had visited the child regularlyonce a weekwith supervision. The mother testified that she had good reasons for any visit she missed. The mother testified that she had missed some visits because of her health problems, including three visits when she was in and out of the hospital, and that she had missed other visits because of a lack of transportation. The DHR representative admitted that the mother was never hospitalized for an illegitimate reason and that she never thought the mother was lying about her reasons for missing visitation. The mother had also complained to the DHR representative that the foster parents would not answer the telephone when she called.
In April 2006, DHR "ordered" the mother to pay child support. The mother never paid any child support.
The DHR representative testified that she did not know of any relatives that were interested in taking custody of the child. The child's maternal grandparents were aware that the mother's parental rights could be terminated, but they had not contacted DHR. The maternal grandparents *1102 had visited the child on three occasions under the supervision of the foster parents. DHR had contacted two maternal aunts of the child. One was unable to act as a custodian and the other never returned DHR's telephone inquiries. DHR had attempted to reunite the child with the father, but the father had failed to show any sustained interest in the child. DHR had also requested that the father provide names of potential paternal relative resources for the child, but he had not complied with that request.
The DHR representative testified that the mother and the child still have a good relationship. The child loves the mother and enjoys his contact with her. However, the DHR representative testified that the child's foster parents want to adopt him.

Appellate History
The mother appealed primarily arguing that DHR had failed to use reasonable efforts to reunite the child with her. The mother also argued that the juvenile court had failed to consider other alternatives to the termination of her parental rights. In an opinion released on October 5, 2007, this court remanded the case with instructions for the juvenile court to clarify its findings regarding the mother's abandonment of the child and the reasonableness of DHR's efforts to reunite the mother with the child. H.H. v. Baldwin County Dep't of Human Res., 989 So.2d 1094, 1098 (Ala.Civ.App.2007). We did not consider the mother's argument that DHR had failed to consider other viable alternatives to termination of her parental rights.
On October 25, 2007, the juvenile court revised its judgment to indicate, among other things, that it had found that DHR had used reasonable efforts to reunite the mother with the child before November 2005, but that those efforts had failed, and that the mother had abandoned the child between November 2005 and April 2006 so that DHR no longer had any legal duty to use reasonable efforts to reunite the mother with the child. Thus, on return to remand, we now review the judgment based on the mother's original appellate arguments.

Standard of Review
A juvenile court's factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App. 2007). Additionally, we will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. Id. Clear and convincing evidence is
"`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'"
L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)).

Analysis
A primary goal of the Alabama Juvenile Justice Act, Ala.Code 1975, § 12-15-1 et seq. ("the AJJA"), is to reunite a dependent child and a parent as quickly and as safely as possible. See Ala.Code 1975, § 12-15-1.1; and Calhoun County Dep't of Human Res. v. S.P., 758 So.2d 1107, 1109 (Ala.Civ.App.1999). Pursuant to this goal, the AJJA generally provides *1103 that DHR must use reasonable efforts to reunite a child with its parents. See Ala. Code 1975, § 12-15-65(g)(3) & (m); and J.B. v. Jefferson County Dep't of Human Res., 869 So.2d 475, 481 (Ala.Civ.App.2003) (plurality opinion). Section 26-18-7(a)(6) of the 1984 Child Protection Act, Ala.Code 1975, § 26-18-1 et seq. ("the CPA"), further implies that DHR has a duty to use reasonable efforts leading toward the rehabilitation of the parent. See D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 589 (Ala.Civ.App.1999). Construing these two provisions together, when parental conduct, conditions, or circumstances prevent immediate reunification with the child, DHR ordinarily is required by law to use reasonable efforts to rehabilitate the parent in order to facilitate eventual reunification with the child. C.B. v. State Dep't of Human Res., 782 So.2d 781, 785 (Ala.Civ.App.1998) ("DHR has the duty to make reasonable efforts to rehabilitate [a parent] so that family reunification might be attainable.").
However, in cases in which the parent subjects a child to an aggravated circumstance, such as abandonment, the AJJA provides that DHR is relieved of its duty to use reasonable efforts to reunite the child with the parent. Ala.Code 1975, § 12-15-65(m)(1) ("[r]easonable efforts shall not be required to be made ... where a court of competent jurisdiction has determined that a parent has ... [s]ubjected the child to an aggravated circumstance, including, but not limited to, abandonment"); see also 42 U.S.C. § 671(a)(15)(D). Because the overarching purpose of rehabilitation is to reunite the parent with the child, see C.B., supra, once DHR's duty to attempt to reunite the parent and child is terminated as a result of the parent's abandonment of the child, DHR's statutory duty to attempt to rehabilitate the parent likewise ends. J.B., 869 So.2d at 481.
In this case, the juvenile court found that the mother had abandoned the child between November 2005 and April 2006. For the purposes of the CPA, "abandonment" is defined as:
"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
Ala.Code 1975, § 26-18-3(1). As this court has noted, § 26-18-3(1) sets out multiple, alternative grounds upon which a trial court may find that a parent has abandoned the child. J.L. v. State Dep't of Human Res., 961 So.2d 839, 848-49 (Ala. Civ.App.2007). In J.L., the court held that a parent, whose voluntary actions had led to his incarceration and subsequent inability to perform his parental duties and to maintain contact with the child, had abandoned the child for the purposes of § 26-18-3(1). In Ex parte F.P., 857 So.2d 125, 138 (Ala.2003), our supreme court stated that "[t]he definition of abandonment in § 26-18-3(1) ... recognizes excuse as a basis on which to avoid abandonment." As those cases illustrate, all the grounds for abandonment depend on the parent's voluntary, intentional, and unjustified conduct. See L.M. v. D.D.F., 840 So.2d at 179 ("Abandonment implies an intentional act on the part of the parent."); but see K.W.J. v. J.W.B., 933 So.2d 1075, 1080 (Ala.Civ.App.2005) (Murdock, J., dissenting) (arguing that the last two grounds for abandonment may be found without proof of purpose or intent). By implication, therefore, a finding of abandonment may *1104 not be predicated on involuntary, unintentional, and/or justifiable parental conduct.
In this case, it is undisputed that between November 2005 and April 2006 the mother did not physically visit the child or contact DHR, but the record contains no evidence indicating that the mother did not communicate with the child via telephone or other means during that period. The only evidence in the record on this point consists of the mother's testimony that the foster parents would not return her telephone calls at times; the DHR representative confirmed that the mother had complained that the foster parents were not returning her calls. That evidence indicates that the mother did not voluntarily cease contact with the child.
With regard to missing visits, the mother testified unequivocally that she had missed visits with the child only due to medical and transportation problems. The evidence shows that between November 2005 and April 2006 the mother resided in Pensacola, Florida. During that time, as at all times up to the point of the final adjudicatory hearing in this matter, the mother did not own an automobile but depended on others for transportation. The DHR representative testified that DHR did not offer the mother bus tickets to address her transportation problems until April 12, 2006. The record contains no evidence indicating that the mother could have traveled to visit with the child between November 2005 and April 2006 but had simply refused to do so.
The evidence indicates that the mother developed severe medical problems around April 2005. The DHR representative testified that the mother told DHR that she had been sick from April 2005 through September 2006. The DHR representative admitted that the mother had suffered legitimate, disabling health problems during that period. The DHR representative also admitted that she never thought the mother was lying about her reasons for missing visitation. DHR presented no evidence indicating that the mother could have visited with the child despite these health problems.
Based on a "careful search of the record," see In re Moore, 470 So.2d 1269, 1270 (Ala.Civ.App.1985), we conclude that the record does not contain clear and convincing evidence that the mother intentionally, voluntarily, and unjustifiably failed to claim the rights of a parent; failed to perform the duties of a parent; or withheld her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection.

Reasonable Efforts
Because the record does not contain clear and convincing evidence of abandonment, DHR had a duty to use reasonable efforts to rehabilitate the mother and to reunite her with the child. As stated in State ex rel. A.C., 97 P.3d 706 (Utah Ct.App.2006):
"We conclude that the phrase `reasonable efforts,' although undefined in [the Utah Code], is not ambiguous, for the legislative meaning can be gleaned from the definition of the individual words comprising the phrase....
"Reasonable is commonly defined to mean `not extreme or excessive' or `fair.' Merriam-Webster's Collegiate Dictionary 974 (10th ed.1999). `Effort' is commonly defined to mean `conscious exertion of power: hard work' or as a `serious attempt.' Id. at 368. Thus, [the appropriate state agency] would comply with its statutory obligation to make reasonable efforts toward reunification if it makes a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights. See also In re Eden F., 48 *1105 Conn.App. 290, 710 A.2d 771, 782-83 (1998) (noting that `the word ["]reasonable["] is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged' and that `reasonableness is an objective standard and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case' (citation omitted)), rev'd on other grounds, 250 Conn. 674, 741 A.2d 873 (1999); accord In re J.D., 2001 WL 1042577, at *7-8, 2001 Conn. Super LEXIS 2358, at *21-22 (Conn.Super.Ct. Aug.8, 2001)."
97 P.3d at 712. Whether DHR has fairly and seriously attempted to rehabilitate the parent and reunite the parent with the child is a fact-dependent inquiry. J.B., 869 So.2d at 482.
The natural starting point in any fair and serious attempt to rehabilitate the parent and to reunite the parent with the child is identification of that characteristic, conduct, or circumstance that renders the parent unfit or unable to discharge his or her parental responsibilities to the child. Once DHR identifies the source of parental unfitness, the overarching goal of family reunification requires DHR to communicate its concerns to the parent and to develop a reasonable plan with the parent that is tailored toward the particular problem(s) preventing the parent from assuming a proper parental role. DHR should use reasonable methods to achieve its plan of removing or reducing the identified obstacle(s) to family reunification "as quickly and as safely as possible." Ala.Code 1975, § 12-15-1.1(3).[5] Finally, at the termination of any rehabilitation process, DHR should determine the success of its efforts, using reasonable evaluation tools. See In re Vincent B., 73 Conn.App. 637, 644-47, 809 A.2d 1119, 1124-25 (2002) (holding that the burden is on state child-protection agency to make "reasonable efforts to achieve reunification by engaging the [parent] and making available services aimed at instilling in him [or her] healthy parental skills," to give the parent "a window of opportunity during which reasonable efforts at reunification should have been made," to apprise the parent of the steps to be taken to achieve rehabilitation, and to give the parent feedback on his or her progress in reaching that goal).
In this case, the DHR representative testified that DHR originally took custody of the child based on reports that the mother had left the child with a nonrelative for an extended period of time without proper medication. DHR subsequently evaluated the mother's home and found it to be substandard and unsuitable for the child. In addition, DHR believed the mother might have been abusing drugs, which, DHR believed, contributed to the mother's inability to properly care for the child. Based on those concerns, DHR held a series of ISP meetings with the mother. In the first meeting, DHR notified the mother that in order to regain custody of the child, in addition to regularly visiting with the child, she would have to submit to random drug testing, obtain appropriate living arrangements, and obtain and maintain steady employment or income.
However, as the DHR representative testified at the termination hearing,[6] during *1106 the relevant period, DHR did not offer the mother any services designed to assist the mother in overcoming her drug problem,[7] in obtaining appropriate housing,[8] or in obtaining employment or steady income. The DHR representative testified that the only services DHR offered the mother were supervised visitation, random drug testing, and bus tickets so that she could attend ISP meetings and drug testing. These services certainly would have facilitated DHR's ability to monitor the mother and to check her progress if she had been undergoing rehabilitation; however, these services hardly constitute a fair and serious attempt to cure the mother's substance-abuse, housing, and income problems so that she could quickly and safely reunite with the child. The juvenile court's finding that DHR used reasonable efforts to rehabilitate the mother and to reunite her with the child is not supported by clear and convincing evidence.
Nevertheless, the dissent argues that the juvenile court could have properly inferred that the mother was "unable or unwilling to address her drug-dependency problems and other parenting issues until the eve of trial." 989 So.2d at 1111 (Thomas, J., dissenting). However, even if we assumed that that factual conclusion was supported by clear and convincing evidence, such a finding would not have relieved DHR of its initial duty to design a reasonable reunification plan. The legislature *1107 has specifically addressed the effect of a parent's unreasonable failure to participate or to cooperate with DHR's rehabilitation and reunification efforts. In a proceeding to terminate parental rights, a juvenile court must consider a parent's lack of effort to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached with DHR as evidence of the parent's inability or unwillingness to discharge his or her parental responsibilities to and for the child. Ala.Code 1975, § 26-18-7. This statute contemplates that a parent's actual lack of effort is to be considered in relation to a reasonable reunification plan that is already in place. The statute negates any implication that the legislature intended that DHR would not have to formulate a reasonable reunification plan in cases in which DHR or the juvenile court concluded that the parent might not or even probably would not follow the plan. Therefore, to the extent the juvenile court concluded that the mother's predicted failure to attempt to rehabilitate excused DHR from offering the mother any services directed toward eliminating her drug-abuse, housing, or income problems, the juvenile court erred as a matter of law.
The thornier question is whether the failure of DHR to use reasonable efforts to rehabilitate the mother and reunite the mother with the child requires a reversal of the juvenile court's judgment. In its brief, DHR argues that in In re Hutchins, 474 So.2d 1152, 1154 (Ala.Civ.App. 1985), this court decided that DHR has no duty to attempt to rehabilitate a parent, but may do so voluntarily, in which case the juvenile court shall consider whether the attempt at rehabilitation failed merely as a factor in deciding whether the parent is unable or unwilling to discharge his or her responsibilities to the child. The holding of Hutchins would seem to indicate that a failure by DHR to use reasonable efforts to rehabilitate the mother would not necessitate a reversal of the juvenile court's judgment.
However, as pointed out in J.J. v. Lee County Department of Human Resources, 979 So.2d 823, 831-32 (Ala.Civ.App.2007), Hutchins was decided before the changes in the AJJA and the CPA that were brought about by the enactment of the federal Adoption and Safe Families Act of 1997. Public L. No. 105-89, 111 Stat. 2115 (1997), codified at 42 U.S.C. § 670 et seq. ("the ASFA"). The ASFA provides that in order for a state to receive matching federal funding for foster-care programs, the state must establish a plan that requires reasonable efforts to preserve and reunify families to make it possible for a child to safely return to the child's home, except in certain stated circumstances. 42 U.S.C. § 671(15). The ASFA requires a state to use reasonable efforts at reunification in order to assure that, before the expenditure of federal funds for foster care, a state will use reasonable efforts to prevent the need for continued foster care. See Kurtis A. Kemper, Annotation, Construction and Application by State Courts of the Federal Adoption and Safe Families and Its Implementing State Statutes, 10 A.L.R.6th 173 (2006). It is the policy of the ASFA for states to act as quickly as possible to ascertain the viability of reunification and to use reasonable efforts to achieve that goal so as to avoid protracted foster care and to expedite the adoption or other permanent placement of the child. Id. In any event, to be eligible for federal funding, a state must hold a permanency hearing within at least 12 months of the child's entering foster care in order to determine the permanency plan for the child, including the child's permanent living arrangement. See 42 U.S.C. § 675(5)(c). Under the ASFA, a state generally must file or join a petition to *1108 terminate the parental rights of a child's parents when the child has been in foster care for 15 of the most recent 22 months. Id. at § 675(5)(E).
In reaction to the ASFA, the Alabama legislature amended the AJJA and the CPA. See Ala. Acts 1998, Act No. 98-372. Section 12-15-65(g)(3) now provides that if a juvenile court enters an order continuing placement of a child outside the home, the juvenile court must make a specific finding, if warranted by the evidence, that reasonable efforts have been made or will be made to reunite the child with his or her family or that reasonable efforts at reunification have failed.[9] Section 12-15-65(m) states that "reasonable efforts" refers to, among other things, efforts made to preserve and reunify families to make it possible for a child to return safely to the child's home. Section 12-15-62(c) requires juvenile courts to hold permanency hearings within 12 months of any court order placing a child in foster care. At that hearing, DHR is required to present a plan for the permanent disposition of the child, including, if applicable, a termination of the parental rights of the child's parents. Section 26-18-5(b) further generally requires that DHR shall file or join a petition to terminate parental rights when the child has been in foster care for 15 of the most recent 22 months.
It is apparent that in enacting the changes to the AJJA and the CPA to comply with the ASFA, the Alabama legislature has committed DHR to use reasonable efforts to reunite foster children with their parents in the family home as quickly and as safely as possible so that the state may qualify for federal assistance to provide quality foster care for its children in need. The duty to use reasonable efforts toward reunification now found in § 12-15-65 naturally encompasses the duty to rehabilitate the parent when that rehabilitation will facilitate reunification. J.B., supra. Hence, under current law, except in those cases specifically excepted under the language of § 12-15-65(m), DHR has a statutory duty to use reasonable efforts to rehabilitate a parent if such efforts could reasonably lead to reunification with the child. Moreover, due to the deadlines imposed in §§ 12-15-62(c) and 26-18-5(b), DHR has a duty to act as soon as the child is first removed from the parental home to implement reasonable efforts at rehabilitation so that, if possible, the child's return to the family home will be expedited and the child's placement in foster care will be shortened. Any failure by DHR to fulfill its statutory duty undermines the policy of the state and jeopardizes the federal funding that the state depends upon to maintain its foster-care program.
A judgment terminating parental rights based on an erroneous finding that DHR has used reasonable efforts to reunite a parent with his or her child violates § 12-15-65(g), which requires that such a finding must be "warranted by the evidence." If a judgment containing such an erroneous finding error were not reversible, DHR could forgo reasonable efforts at reunification in every case and then claim that the parent's rights should be terminated because of his or her failure to correct the conduct, condition, or circumstances that led to the removal of the child. DHR would never have to comply with the ASFA's reasonable-efforts requirement, one of the primary conditions for securing federal funding for the state foster-care program. These considerations compel us to conclude that a juvenile court commits reversible error when it terminates parental rights based on an erroneous finding that DHR used reasonable *1109 efforts to reunite a parent with his or her child. See, e.g., In re Tiffany B., 228 S.W.3d 148, 160 (Tenn.Ct.App.2007) (holding that, because evidence indicated that state child-protection agency did not use reasonable efforts to reunite child with parent, "we have no choice other than to vacate the order terminating the [parent's] parental rights and remand the case for further proceedings"); State ex rel. A.T., 936 So.2d 79 (La.2006) (affirming lower appellate court's ruling that trial court's judgment terminating parental rights must be reversed based on lack of evidence of reasonable efforts at reunification); and In re Shaiesha O., 93 Conn.App. 42, 887 A.2d 415 (2006) (accord).
Accordingly, in order to protect the important state policies at issue, we reverse the judgment terminating the mother's parental rights and remand the case to the juvenile court for further proceedings consistent with this opinion.[10]
REVERSED AND REMANDED.
THOMPSON, P.J., concurs in the result, without writing.
BRYAN, J., concurs in the result, with writing.
THOMAS, J., dissents, with writing, which PITTMAN, J., joins.
BRYAN, Judge, concurring in the result.
I do not believe that the mother's abandonment of the child was established by clear and convincing evidence.
Regarding reasonable efforts, certain provisions in the Alabama Juvenile Justice Act, codified at § 12-15-1 et seq., Ala. Code 1975, imply that the Department of Human Resources ("the Department") must exert reasonable efforts to rehabilitate a parent to achieve the goal of reunification, as the main opinion states. See, e.g., § 12-15-65(g)(2) and (3), Ala.Code 1975 (requiring a court to find that "reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home" and that "reasonable efforts have been made or will be made to reunite the child and his or her family, or that efforts to reunite the child and his or her family have failed" when a court enters an order that, among other things, removes a child from his or her home); and § 12-15-65(m), Ala.Code 1975, (concluding that the Department must exert reasonable efforts "to make it possible for a child to return safely to the child's home" barring extenuating circumstances). Furthermore, this court, as the main opinion states, has held that the Department has a duty to exert reasonable efforts to rehabilitate a parent. J.L. v. State Dep't of Human Res., 961 So.2d 839, 849 (Ala. Civ.App.2007), and B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004) (citing § 12-15-65, Ala.Code 1975).
I conclude that the Baldwin County Department of Human Resources ("DHR") failed to exert reasonable efforts to achieve the objective of reuniting the child with the mother. Children need stability, permanency, and security. DHR's failure to exert such efforts has not fostered the child's best interests of attaining stability, permanency, and security. If DHR had exerted reasonable efforts to rehabilitate the mother in a timely fashion, the child, who has been in foster care since April 2005, may have been returned to the mother much earlier or DHR could have prevailed *1110 in terminating the mother's parental rights due to her failure to rehabilitate.
Although I note that many of the mother's actions clearly demonstrated her poor judgment, the mother's shortcomings did not relieve DHR of its duty to exert reasonable efforts to rehabilitate her.
I further note that, once DHR provides services to the mother in the near future, it is incumbent upon her to promptly avail herself of those services in order to facilitate the goal of reunification. However, if the mother fails to do so in a timely manner, she places her parental rights in peril by demonstrating that she is either unwilling or unable to discharge her parental responsibilities to and for the child. See § 26-18-7(a)(6), Ala.Code 1975 (providing that the failure of reasonable efforts exerted by the Department to rehabilitate a parent is a sufficient ground warranting the termination of a parent's parental rights). Then, DHR could expeditiously petition to terminate the mother's parental rights.
DHR's failure to follow the mandates of statutes and caselaw to exert reasonable efforts to rehabilitate the mother has caused the child to languish in a volatile state without any sense of permanency and stability. This is regrettable and unacceptable.
THOMAS, Judge, dissenting.
First, I believe the evidence was sufficient to support the juvenile court's determination that the mother had abandoned the child between November 2005 and April 2006. Therefore, I do not believe that DHR was required to use reasonable efforts to rehabilitate the mother after April 2006. See § 12-15-65(m)(1), Ala. Code 1975 (providing that "[r]easonable efforts [to reunite a parent with a child] shall not be required to be made ... where a court of competent jurisdiction has determined that a parent has ... [s]ubjected the child to an aggravated circumstance, including, but not limited to, abandonment"). Second, I think DHR made reasonable efforts to rehabilitate the mother and to reunite her with the child before November 2005.
The main opinion states that "`"whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case."'" 989 So.2d at 1105 (quoting State ex rel. A.C., 97 P.3d 706, 712 (Utah Ct.App.2006), quoting in turn In re Eden F., 48 Conn. App. 290, 710 A.2d 771 (1991)). I agree. The main opinion also states that "[w]hether DHR has fairly and seriously attempted to rehabilitate the parent and to reunite the parent with the child is a fact-dependent inquiry." 989 So.2d at 1105 (citing J.B. v. Jefferson County Dep't of Human Res., 869 So.2d 475, 482 (Ala.Civ.App. 2003)). Again, I agree. I cannot agree, however, with the conclusion in the main opinion that DHR failed, under the particular circumstances of this case, to make reasonable efforts to rehabilitate the mother between June 2005 and November 2005.
The mother submitted to her first urine drug screen on June 13, 2005. When confronted with the resultsthat she had tested positive for both cocaine and marijuanathe mother denied drug use and said that someone must have slipped something into her drink while she was at a party in Pensacola, Florida. The mother refused to take a hair-follicle drug test and made excuses when social worker Jennifer Castle requested, on at least five other occasions, that she submit to another random drug-screen test. Although drug testing does not itself "rehabilitate" a drug offender, it is often what triggers an offender's acknowledgment of the existence of a drug problem, which, in turn, provides the offender with the opportunity to accept *1111 personal responsibility for his or her problem and to seek treatment. DHR has no power to force a parent to undergo drug-rehabilitation treatment. Without the mother's acknowledgment of her drug problem, acceptance of personal responsibility for the problem, and resolve to address the problem, I cannot conclude and, obviously, neither could the juvenile courtthat DHR's efforts in this regard were unreasonable.
Moreover, in order for DHR to have made any progress in assisting the mother with overcoming a drug dependency, the mother would have had to have been present and available on a regular basis. According to Castle's trial testimony, the mother was simply unreachable during much of the time between June 2005 and November 2005. Castle said that she had tried to contact the mother "multiple times" at the address of K.H.'s mother; on those occasions, K.H.'s mother either told Castle that the mother was in Pensacola or that K.H. did not know where the mother was.
The mother testified at trial in January 2007 that she was no longer taking drugs. Even if the juvenile court believed that testimony, it would not have been required to believe that the mother's failure to have overcome her drug dependency earlier was attributable to DHR's not having made reasonable efforts to rehabilitate her. As the juvenile court observed at the close of the trial:
"THE COURT: [I]t never ceases to amaze me how in a [termination-of-parental-rights] case I hear testimony that there's very little effort until someone is served with the [termination-of-parental-rights] petition. And then suddenly they are putting in for parent of the year or they're at least complaining that DHR [has not] made their way for them. It just never ceases to amaze me and I believe I have some of that going on here."
The juvenile court apparently concluded that, irrespective of any efforts by DHR, the mother was simply unable or unwilling to address her drug-dependency problems and other parenting issues until the eve of trial. Although the main opinion cites authorities for the proposition that whether DHR made reasonable efforts is, in any given case, a "fact-dependent inquiry," it substitutes its judgment for that of the juvenile court with respect to what inference can reasonably be drawn from the facts. I respectfully dissent.
PITTMAN, J., concurs.
NOTES
[1] The judgment also terminated the parental rights of J.O., the child's father. The father has not appealed.
[2] DHR also argues that in In re Hutchins, 474 So.2d 1152, 1154 (Ala.Civ.App.1985), the court indicated that DHR has no duty to rehabilitate a parent, but that it may do so voluntarily, in which case the juvenile court shall consider whether the attempt at rehabilitation failed as a factor in deciding whether the parent is unable or unwilling to discharge his or her responsibilities to the child. DHR accurately summarizes this statement from Hutchins. However, because the case was not decided on that issue, the statement is dicta. At any rate, the statement is no longer correct due to subsequent changes in the Alabama Juvenile Justice Act requiring DHR to use reasonable efforts to reunite the child with its parents as mandated by the federal Adoption and Safe Families Act as set out above.
[1] The judgment also terminated the parental rights of J.O., the child's father. The father has not appealed.
[2] This report was partially erroneous. The child did not have a seizure disorder and had not been left without appropriate medication.
[3] The record is not clear as to whether the DHR representative recommended that the mother terminate her relationship with K.H. or whether she simply indicated that DHR would not look favorably on any living arrangement involving K.H.
[4] The DHR representative testified that she could not verify whether K.H. had been convicted of any of those crimes.
[5] DHR and the juvenile courts are required to give the parent a reasonable time to rehabilitate. "At some point, however, the child's need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent." M.W. v. Houston County Dep't of Human Res., 773 So.2d 484, 487 (Ala.Civ.App.2000).
[6] The following colloquy took place between the mother's attorney and the DHR representative:

"Q: ... At that time did you discuss with her any options for treatment or rehab?
"A: No.
"Q: Did you ever consider discussing with her any options for treatment or rehab?
"A: No.
"....
"Q: ... When youwhen you talked to [the mother] you found her living in such squalornot squalor, but such a destitute situation, did you discuss with her whether or not the father of [the child] had been paying any child support?
"A: No.
"Q: Okay. So you don't know whether or not any child support has been paid to her that would help her to take care of the child at that time?
"A: No.
"....
"Q: Between January of 2005 and December of 2006 did you or anybody at the Department of Human Resources talk to her about Section 8 housing?
"A: No.
Q: Did you or anybody at the Department of Human Resources talk to her about the Displaced Homemaker program?
"A: No.
"Q: Did you or anybody else at the Department talk to her about any possible resources to help her ... to become an independent person?
"A: No.
"....
"Q: You listed four issues, drugs, the living environment, her ability to independently care for herself and the visits. And again I will ask you other thanyou obviously know she is a drug user or was a drug user, what services did DHR ever say, you know what, [mother], I know you're dumb. I know you live in squalor, but by gosh here's something we can offer you as far as therapy for drug users. Did you even mention to her this is how you get off drugs? Anything?
"A: No.
"....
"Q: Okay. Did at anytime anybody from [DHR] say to her, okay, you're living here without income, without child support, without a good job skill, this is how we can provide services to help you to learn to live independently? Did you ever mention any service whatsoever that we taxpayers could provide to her?
"A: No."
[7] DHR does not argue that it had no duty to use reasonable efforts on the basis that the mother subjected the child to substance abuse. See Ala.Code 1975, § 12-15-65(m)(1).
[8] In late 2006, the DHR representative learned that the mother was actively seeking suitable housing; the DHR representative testified that she decided at that time that there was no need for DHR to help the mother obtain appropriate living arrangements.
[9] This statute was actually enacted in 1995. See Ala. Acts 1995, Act No. 95-545.
[10] Because we are reversing on the ground that DHR failed to use reasonable efforts to rehabilitate the mother and to reunite the mother with the child, we do not address the mother's other argument that the juvenile court failed to consider some other placement option that would allow the mother to maintain contact with the child.