MOORE, Chief Justice
(dissenting).
By quashing the writ, this Court leaves in place the decision of the Court of Civil Appeals affirming the juvenile court’s judgment terminating the parental rights of J.W., the mother, and M.W., the father. Because I believe that clear and convincing evidence did not support termination of the parental rights of M.W. and that the juvenile court relied on an improper factor in deciding to terminate M.W.’s parental rights, I respectfully dissent.

I. Factual Background

A caseworker for the Alabama Department of Human Resources (“DHR”) discovered that eight-year-old D.W. was living in “deplorable conditions” and removed him from the parents’ home. As the juvenile court explained:
“The residence was found to be unsuitable for habitation and unsafe for a child because of the filth, clutter, unsafe conditions, and bad state of repair of the structure. A worker witnessed the floors to be littered with mud. The furniture was in poor condition. Dirty dishes were piled in the kitchen. [The DHR caseworker] witnessed a cat jump up on the dishes in the sink with a mouse in its mouth. Exposed wiring hung from the ceiling and several windows had been busted out and improperly patched. Electricity was furnished to the home via an extension cord which ran from another building on the property.
“The DHR worker found that [D.W.] was dirty. His clothes were filthy and smelled, [D.W.’s] teeth were decaying and he had failed the first grade. [D.W.’s] Medicaid had been allowed to lapse. He was not taking his ADHD [attention deficit/hyperactivity disorder] prescription and was exposed to adults in the home who abused illegal drugs.”
M.W. took steps to remedy the situation. In particular, he moved out of the home into an apartment, which DHR found to be a suitable habitat for D.W. At DHR’s request, M.W. submitted to psychological testing; the psychologist “noted no problems” and did not recommend counseling. Although J.W. tested positive for drugs, including cocaine, M.W. “tested negative for all drugs.” M.W.’s counsel questioned a DHR caseworker regarding M.W.’s drug tests:
“Q. You’re aware that [M.W.] has never failed a drug test. Correct?
“A. I am aware of that. Yes.”
The foster-care worker gave the same answer: “[M.W.] never tested positive for substance abuse.”
Affection between father and son was strong. The DHR service plan noted that “[D.W.] is very attached to his father” and that “[M.W.] is very bonded and dedicated to [D.W.].” D.W.’s elementary-school principal stated that “D.W. was really upset when he was taken away from [his parents] the very first time. And we were all crushed. We felt bad for him because we realize that he loves, you know, [M.W.].” Asked about D.W.’s weekend visits with his father, the foster parent explained that “[D.W.] enjoyed going to visit his daddy. You know, he looked forward to it .... ” After the first couple of visits, the foster mother complained that D.W. had not bathed before being returned to her. “But after that was addressed,” she stated, M.W. sent D.W. back to her in clean *459 clothes. Thus the cleanliness situation “got better.”
The parenting-assessment counselor asked M.W. if he would put D.W. back into an environment where he would be exposed to J.W.’s drug use. The counselor testified that “[M.W.] said that he would tell her she had to leave, but that if she didn’t, then they would just have to, kind of, deal with that when they got to it.” Although the counselor stated that MW. “minimizes the dangers presented by family drug use,” she also related that “[M.W.] specifically said he wished that he had been aware of the drug issues and had done something about it.” The foster-care worker admitted that M.W. had repeatedly told her that he would not expose D.W. to drug users. Yet she recommended termination of M.W.’s parental rights out of fear that M.W. did not appreciate the danger of such contact. When asked if rehabilitative services could ameliorate the concern, she answered: “I can’t say one way or the other.”[1]
Responding to his attorney’s questions, M.W. testified as follows:
“Q. Did you keep your apartment on Moore Street clean?
“A. Yes.
“Q. And when [D.W.] would come to see you on Moore Street, would you give him a bath before he went back home?
“A. Yes.
“Q. And did you wash his clothes?
“A. Yes.
“Q. Did you ever allow [D.W.] to be around any drug use when he came to see you?
“A. No.
“Q. If the Court gave you back custody of [D.W.], would you keep him away from anybody who does drugs?
“A. Yes.
“Q. And do you believe that one day your wife and daughter will get off drugs?
“A. Yes.
“Q. And only when they get off drugs, is that when you’ll allow him to be back around your wife and daughter?
“A. Yes.
[[Image here]]
“Q. Until you’re sure that your wife and your daughter are no longer doing drugs, are you willing to keep them away from [D.W.]?
“A. Yes.
“Q. Do you fully appreciate the dangers to your child that are caused by drug use?
“A. Aware of the dangers, yes.”
When asked about the condition of the home, M.W., a carpenter, stated: “I’m, right now, remodeling the house. I’ve bought sheet rock. I’ve already tore out— gutted the inside. And ready to put new rafters up and put a new wall up. I’m in that process now.” Although M.W. stated that his ultimate goal was to return to the home, those statements did not mean that he intended to return to it in its former condition. Instead he testified that he was remodeling the home and that J.W. had moved to her mother’s residence while the work was occurring. Furthermore, he stated numerous times that he did not intend to allow D.W. to be around drug users. By moving to an apartment, M.W. demonstrated his seriousness about pro *460 tecting his parental rights and being reunited with D.W.

II. Analysis

A. Clear-and-convincing evidence standard

“Inasmuch as the termination of parental rights strikes at the heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances.” Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Evidence that “the parents of a child are unable or unwilling to discharge their responsibilities” has to be “clear and convincing.” § 12-15-319(a), Ala.Code 1975. Clear and convincing evidence is “[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” § 6 — 11— 20(b)(4), Ala.Code 1975. Section 12 — 15— 319(a) provides a list of 12 factors for a trial court to consider in deciding whether to terminate parental rights. Very few of these factors seem to apply to M.W. For example, M.W. has not abandoned his child; does not have mental, emotional, or substance-abuse problems; has not physically abused his child; and has not been convicted of a felony. § 12-15-319(a)(l)-(6). M.W.’s inability or unwillingness to parent has not been demonstrated to a high degree' of probability. The foster-care worker’s statement that she “can’t say one way or the other” whether M.W. would benefit from rehabilitative services is further proof that the evidence for termination of his parental rights is unclear and unconvincing.
Because the court has to find that “the conduct or condition of the parents ... is unlikely to change in the foreseeable future,” § 12-15-319(a), “the existence of evidence of current conditions ... is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003). By focusing on the conditions present in the house at the time of the initial removal of D.W., the court failed to consider that conditions at the time of trial control in a termination proceeding. At that time M.W. was living in an apartment, everyone had moved out of the house, remodeling was underway, and M.W. had frequently stated that he would not allow D.W. to live in a home with drug users. By focusing on the state of the house in March 2011, the juvenile court failed to apply this necessary branch of the termination analysis.
Even if a court finds that a child is “dependent,” see § 12-15-102(8), Ala.Code 1975, it must also determine before ordering termination of parental rights “whether all viable alternatives to termination have been considered.” Muffoletto v. State Dep’t of Human Res., 537 So.2d 939, 940 (AIa.Civ.App.1988). The court rejected the alternative of giving custody to C.W., a family member. D.W. had resided with C.W. for a month and a half when DHR removed him from C.W.’s custody.' The court’s order stated: “The other relative [C.W.] allowed [D.W.] to be around yet another relative with whom [DHR] had an ongoing case.” Based on this vague statement, the court found that C.W. was not a viable alternative to termination of parental rights. Yet D.W.’s elementary-school principal testified that D.W. did better at school after being in the custody of C.W., that C.W. was a good parent, and that C.W.’s own child did well at school. The stated grounds in the court’s order for rejecting placement with C.W. are neither clear nor convincing.

B. Failure to divorce

Apart from not applying the correct analysis under the relevant evidentiary *461 standard, the court and DHR applied an astonishing factor as a ground for termination: the failure of M.W. to divorce J.W.
The development of this “ground” began with a question from the guardian ad litem to a DHR employee.
“Q. Okay. And at all times, to the best of your knowledge, at all times during the progression of this case, [M.W.] and [J.W.] have been legally married and have not filed for a divorce or any other sort of action to dissolve their marriage, have they?
“A. Not to my knowledge.”
The guardian ad litem then questioned D.W.’s foster-care worker as follows:
“Q. Okay. Have [M.W. and J.W.] at any point during the pendency of this case ever expressed to you that they will legally separate or legally divorce or do anything so that [M.W.] would be completely separate and apart from [J.W.]?
“A. No. Actually, they’ve stated the opposite.
“Q. Okay.”
Further questioning the foster-care worker, the guardian ad litem asked if M.W.’s refusal to divorce was a factor in the termination decision.
“Q. [I]t is safe to say that one of the biggest barriers to [M.W.’s] being reunified with [D.W.] was him maintaining his marriage to [J.W.] and to his expressed desire to return to the residence.... ?
“A. Yes. But not only [J.W.] but also his daughter....”
During closing argument, the guardian ad litem said that M.W. “continued to state throughout the pendency of this ease that as soon as we were all basically out of his life, that he was moving right back [to the home].” MW.’s attorney corrected her: ‘Your Honor, that’s a mischaracterization of the testimony you heard today. You heard [the foster-care worker] testify that [M.W.] said that as soon as everybody was off drugs, that he wanted to move back.” The guardian ad litem then recanted and pivoted to the divorce theme.
“I apologize if I misquoted. But regardless, he continued to maintain that he intended to stay married to [J.W.] ...
“... And due to the fact that they were still legally married and she wasn’t complying at all, I think that was grounds.”
MW.’s refusal to divorce J.W. at the behest of DHR was a crucial consideration in DHR’s decision to seek termination of his right to parent D.W. In its brief to this Court, DHR states: “One of the biggest barriers to reunification is MW.’s desire and intent to remain with J.W....” DHR’s brief, at 12. DHR later derides M.W.’s lawful marriage commitment as “his voluntary continued cohabitation with J.W.” Id. at 23. DHR seems to have presented M.W. with an ultimatum: divorce your wife or lose your son. Unfortunately, the trial judge repeated this apparent requirement in his termination judgment: “[D.W.’s] current caseworker testified and confirmed DHR’s efforts to get [M.W.] to acknowledge the problems in the family and the problems with the residence. During the pendency of this case, the [parents] have never offered to separate or divorce.” (Emphasis added.)
“Parental rights are indeed cherished and deserve the law’s utmost protection against unwarranted interference.” Ex parte Beasley, 564 So.2d at 954. What greater interference with parental rights could occur than to make the destruction of the marital bond a condition for a father to retain his relationship with his son? “The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.” Loving v. Virginia, *462 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). No statute, court decision, or practice of the common law grants the State power to demand that a husband divorce his wife on penalty of losing his child. A California court, faced with a similar demand, noted:
“One of the most disturbing ... aspects of this case is ... the attempt of social workers to get Blanca to separate from her husband Rogelio. ‘Mr. P[J resented the attempts of the Social Services to break up his marriage. “They” have told his wife that if she leaves him, she might have a chance to get her children back.’ We are mindful that the Legislature has declared a prime purpose of California’s juvenile dependency statutes is the reunification of families, not their breakup.”
Blanca P. v. Superior Court of Orange Cnty., 45 Cal.App.4th 1738, 1755 n. 13, 53 Cal.Rptr.2d 687, 698 n. 13 (1996). See § 12-15-312(b), Ala.Code 1975 (setting out DHR’s obligation to make reasonable efforts to preserve and reunify families under most circumstances); L.M. v. Shelby Cnty. Dep’t of Human Res., 86 So.3d 377 (Ala.Civ.App.2011) (finding that DHR presented insufficient evidence to justify its demand that common-law parents separate as a condition for father to retain his parental rights); H.H. v. Baldwin Cnty. Dep’t of Human Res., 989 So.2d 1094, 1105 (Ala.Civ.App.2007) (noting “the overarching goal of family reunification”).

III. Conclusion

According to the United States Supreme Court, the right of parents to custody of their children “is perhaps the oldest of the fundamental liberty interests.... ” Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). This fundamental liberty interest “does not evaporate simply because [parents] have not been model parents or have lost temporary custody of their child to the State.” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The juvenile court failed to base its analysis on current conditions. The findings that M.W. was an unfit parent who could not be rehabilitated and that custody with C.W. was not a viable alternative are not supported by clear and convincing evidence. Furthermore, the court relied on the nonstatutory and highly questionable factor of M.W.’s refusal to divorce J.W. as a ground for termination of his parental rights.[2]
Because I would reverse the Court of Civil Appeals’ judgment affirming the juvenile court’s decision to terminate M.W.’s parental rights and remand the case for the juvenile court to reconsider its findings, I respectfully dissent from the majority’s decision to quash the writ.

. The parenting assessment did not occur until 10 months after D.W.’s removal from the home and only 2 months before DHR recommended termination of M.W.’s parental rights. The foster-care worker conceded that the assessment "was done for corroboration” and not for the purpose of rehabilitation. No services, such as parenting classes, were ever offered to M.W.

. What if J.W. dies, thus undercutting a significant part of the juvenile court’s rationale for terminating M.W.’s parental rights? Could M.W. then seek reconsideration of the judgment under Rule 60(b), Ala. R. Civ. P.?