THOMAS, Judge.
 

 B.J.K.A. (“the mother”) has four children, W.K., R.A.A., A.A., and W.R. In October 2003, before W.R. was born, the Cleburne County Department of Human Resources (“DHR”) took custody of the mother’s three older children after a caseworker responded to the mother’s residence to investigate a child-abuse/neglect report regarding hazardous conditions in the home. Once the worker arrived, she noticed that the mother appeared to be under the influence of an intoxicating substance because she was slurring her words and stumbled; the mother went to lie down after the worker arrived. The mother eventually tested positive for methamphetamine, and the children were removed from her care on October 26, 2003. DHR began providing services to the mother, including a psychological assessment, a drug assessment, drug screens, visitation with the children, and participation in the Family Options program. Although the mother was offered inpatient drug treatment, she chose not to avail herself of the treatment, opting instead for outpatient treatment. On April 24, 2004, the children were returned to her care.
 

 On May 2, 2005, DHR again took the mother’s three older children into care. The mother had been arrested for possession of drug paraphernalia and was again abusing methamphetamine. DHR offered the mother additional services, including two more psychological assessments; counseling with Carrie Halladay, a licensed professional counselor; drug screens; visitation with the children; and participation in the Family Options program. The mother was again offered inpatient drug treatment, as recommended by Halladay, but the mother left an inpatient-treatment facility only three days into the program; instead, she continued to seek outpatient treatment as a way to resolve her substance-abuse issues.
 

 The mother did not progress to recovery quickly. DHR initially filed a petition to terminate the parental rights of the mother during the children’s second stay in foster care. At some point during the children’s second stay in foster care, the mother developed a relationship with R.R. and became pregnant with W.R. After becoming pregnant, the mother became compliant with DHR requirements, causing DHR to have the termination petition first placed on the administrative docket and then dismissed as the mother maintained sobriety. The children were returned to placement with the mother in August 2007,
 
 *767
 
 and they were ultimately returned to her legal custody in November 2007.
 

 In late March 2008, DHR received another report that the mother was abusing drugs. Although the mother refused to take a drug test at the time a caseworker came to her home to investigate the report, the children were removed from the home on April 17, 2008. The mother submitted to a drug test only after ordered to do so by the juvenile court in July 2008. The drug tests, both a urine screen and a hair-follicle test, were positive for methamphetamine.
 

 DHR offered only drug screens and visitation services to the mother after the children were removed in April 2008. From the time the children were removed from her care in April 2008, DHR had planned to seek termination of the mother’s parental rights once the juvenile court determined that the children were dependent, which it did in July 2008. In September 2008, DHR filed petitions for termination regarding each of the mother’s three older children.
 
 [1]
 
 After a trial, at which the mother failed to appear, the trial court entered separate judgments terminating the mother’s parental rights to the three older children.
 
 [2]
 

 “A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.
 
 Ex parte Beasley,
 
 564 So.2d 950, 954 (Ala.1990).”
 

 B.M. v. State,
 
 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence.
 
 Bowman v. State Dep’t of Human Res.,
 
 534 So.2d 304, 305 (Ala.Civ.App.1988). “ ‘[C]lear and convincing evidence’ is ‘[e]vi-dence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ”
 
 L.M. v. D.D.F.,
 
 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)). The juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct.
 
 R.B. v. State Dep’t of Human Res.,
 
 669 So.2d 187 (Ala.Civ.App.1995).
 

 Section 26-18-7(a), Ala.Code 1975, specifies the grounds for terminating parental rights:
 

 “If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
 

 In deciding whether a parent is unable or unwilling to discharge his or her responsi
 
 *768
 
 bilities to and for a child, the juvenile court may consider several factors, including:
 

 “(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
 

 [[Image here]]
 

 “(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.”
 

 Ala.Code 1975, § 26-18-7(a). In addition, when the child is not in the physical custody of the parent, the juvenile court shall consider, among other things:
 

 “(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
 

 Ala.Code 1975, § 26-18-7(b).
 

 The testimony at trial was provided by three witnesses: Katie McMullen, the current DHR caseworker assigned to this matter; Carrie Halladay, the mother’s former counselor; and David Cunningham, the children’s counselor. McMullen’s testimony primarily outlined the history of the family’s involvement with DHR and the services offered to the mother during the first two periods her children were in foster care. McMullen also testified that the mother had informed McMullen that she had been arrested in Georgia and in Alabama since April 2008. McMullen indicated that the mother was not incarcerated for a long period on either arrest.
 

 McMullen was questioned about why DHR had proceeded to termination so quickly and why it had not provided services intended to rehabilitate the mother after the children were removed from her care in 2008. McMullen pointed out that the children had been in foster care for more than 15 of the previous 22 months, thus requiring DHR to file a petition to terminate the mother’s parental rights unless it had a compelling reason not to do so.
 
 [3]
 
 Ala.Code 1975, § 26-18-5(b). According to McMullen, “the clock” did not start over each time the children were returned to the mother and DHR could consider the other two periods the children had been in foster care when determining whether the mother could be rehabilitated or whether DHR should seek to terminate her parental rights. McMullen explained that DHR had determined that the mother had an established history of progressing sufficiently to permit reunification and then relapsing, requiring the children to be removed from her care again. McMullen stated that the social workers assigned to the family’s case had decided that it was time to achieve permanency for the children.
 

 The mother’s former counselor, Carrie Halladay, testified that the mother had not originally been responsive to counseling during the first few months of treatment, which began in March 2006, during the second period the children were removed from the mother’s custody and were placed in foster care. Halladay testified that she was close to ending her treatment of the mother when the mother became pregnant with W.R. in July 2006 and began to work to meet her treatment goals. Halladay
 
 *769
 
 reported that the mother’s drug of choice was methamphetamine but that the mother had admitted to the abuse of several other illegal drugs, including cocaine, opiates, and marijuana, and that the mother also admitted the use of alcohol.
 

 Halladay said that she had recommended long-term residential or inpatient treatment of 6 to 12 months for the mother, but, she said, the mother had resisted that treatment option. Halladay said that the mother had gone to one residential facility but had stayed only two or three days. According to Halladay, the mother then sought outpatient treatment at “Helping Partners,” which Halladay said the mother “sort of’ complied with. Halladay took issue with the mother’s failure to attend meetings as frequently as she should, commenting that the mother always had “an excuse” for missing her meetings.
 

 Halladay opined that the mother’s relationship with W.R.’s father, R.R., provided her stability and assisted her in reaching and maintaining sobriety. According to Halladay, the mother’s previous relationships had been chaotic and sometimes abusive; Halladay noted that the mother had abused controlled substances with many of her boyfriends. The mother’s pregnancy, said Halladay, also motivated her to reach and maintain sobriety.
 

 Halladay had diagnosed the mother with borderline personality disorder, which she explained as being hallmarked by “chaotic and intense interpersonal relationships and the inability to maintain them” and “impulse control issues,” which Halladay noted resulted in risky behaviors like the mother’s substance abuse. According to Halladay, there are no medications that can control borderline personality disorder. Instead, Halladay said, a person suffering with the disorder needs long-term psychotherapy. Halladay also explained that a person with the disorder can also suffer symptoms of treatable disorders like depression or anxiety disorders, which may be treatable by medication. Halladay said that she felt that the mother might suffer from attention deficit/hyperactivity disorder (“ADHD”) because the mother had several hallmarks of the disorder and because she had described the effect of methamphetamine as calming her and giving her the ability to focus and sleep, much like a prescription drug to treat ADHD would. Although Halladay mentioned to the mother the option of seeking prescription medication to treat ADHD from her personal physician, the mother chose not to do so. Instead, Halladay noted, the mother seemed to seek out methamphetamine as a way to self medicate.
 

 Halladay said that the mother’s long-term, intermittent use of methamphetamine hampered her chance to maintain sobriety, noting that only five percent of methamphetamine addicts totally recover from their addiction. Halladay did admit that those addicts who maintain sobriety for more than a year have a higher likelihood of maintaining sobriety. According to Halladay, she felt that the mother’s chance of maintaining sobriety in October 2007, when she ended counseling, was about as good a chance as she would ever have. Halladay noted that the mother’s chances would have been better with inpatient treatment. When asked what she would have done if the mother had tested positive for methamphetamine in October 2007, Halladay replied that she would have ended her counseling of the mother and would have told the mother there was nothing more Halladay could do for her; she said that the only alternative she would have recommended at that point was long-term inpatient treatment.
 

 When asked about the mother’s relapse, Halladay noted the high degree of relapse
 
 *770
 
 among methamphetamine users. The mother’s counsel described the stressors in the mother’s life before her relapse. He noted that the mother had faced several events that had a major impact on her life, including the demise of a relationship, taking care of four children, including a toddler, and caring for a disabled father whose- condition was worsening. Halladay commented that any stressor is an indicator for relapse.
 

 On appeal, the mother argues that the juvenile court erred in terminating her parental rights when DHR had not provided her any services aimed at rehabilitating her and reunifying her family before filing its petition. There is no question that DHR is required to exert reasonable efforts toward the reunification of a parent and his or her child, except in limited circumstances in which a juvenile court determines that reasonable efforts are not necessary based upon enumerated grounds not relevant here.
 
 See
 
 Ala.Code 1975, § 12—15—65(g)(2) and (g)(3) (requiring reasonable efforts be made to prevent removal except in limited emergency circumstances and to reunite and reunify the family after removal) and § 12-15-65(m) (defining “reasonable efforts” as “efforts made to preserve and unify families,” “to prevent or eliminate the need for” removal, and “to make it possible for a child to return [home] safely”). The mother relies primarily on
 
 H.H. v. Baldwin County Department of Human Resources,
 
 989 So.2d 1094 (Ala.Civ.App.2007) (opinion on return to remand) (authored by Moore, J., with two judges concurring in the result), in which this court reversed a judgment terminating a mother’s parental rights because DHR had failed to use reasonable efforts to rehabilitate her. Specifically, the mother in the present case argues that “[t]he circumstances in [her] previous cases cannot necessarily be extrapolated to predict failure in [her] present case.” She argues that DHR, like it did in
 
 H.H.,
 
 failed to provide her any services to rehabilitate her because it had “predicted” her failure, in contravention of its duty, as described by the main opinion in
 
 H.H.,
 
 to create a plan for rehabilitation and to provide those services tailored to accomplish that plan.
 
 H.H.,
 
 989 So.2d at 1105.
 

 Indeed, the main opinion in
 
 H.H.
 
 indicated that § 26-18-7, which permits a juvenile court to consider a parent’s lack of effort or failure to adjust his or her circumstances when considering a petition to terminate parental rights,
 

 “contemplates that a parent’s
 
 actual
 
 lack of effort is to be considered in relation to a reasonable reunification plan that is already in place. The statute negates any implication that the legislature intended that DHR would not have to formulate a reasonable reunification plan in cases in which DHR or the juvenile court concluded that the parent might not or even probably would not follow the plan.”
 

 H.H.,
 
 989 So.2d at 1107. The main opinion in
 
 H.H.
 
 then determined that the juvenile court’s “conclusion] that the mother’s
 
 predicted
 
 failure to attempt to rehabilitate excused DHR from offering the mother any services directed toward eliminating her drug-abuse, housing, or income problems” was error.
 
 Id.
 

 However, even assuming that
 
 H.H.
 
 were binding precedent, we disagree that it supports a reversal of the termination judgments in the present case. The main opinion in
 
 H.H.
 
 described DHR’s duty to create a plan to rehabilitate a parent.
 
 Id.
 
 at 1105. DHR must identify the problem or issue rendering the parent unable to discharge his or her parental responsibilities, develop a plan to rehabilitate the parent “tailored toward the particular problem(s),” and then, after making efforts to
 
 *771
 
 rehabilitate the parent, evaluate the success of its efforts at the conclusion of the rehabilitation process.
 
 Id.
 
 Based on the mother’s history in the present case, we cannot conclude that DHR failed, in any respect, to “seriously attemptf ] to rehabilitate” the mother.
 
 Id.
 

 Although DHR did not make an attempt to further rehabilitate the mother when it removed the children from her care for the third time in April 2008, DHR had done everything that the main opinion in
 
 H.H.
 
 outlined in its attempts to rehabilitate the mother during the first two periods the children were placed in foster care. DHR had offered the mother psychological assessments, drug assessment, drug treatment, counseling, visitation with the children, and drug screens to monitor her rehabilitation. Twice the mother had managed to satisfy DHR that she had successfully rehabilitated herself and that she was capable of resuming the responsibilities of being a parent to her three older children. Sadly, after each reunification, the mother again returned to the abuse of methamphetamine, placing her children at risk and necessitating their removal from her custody both a second and a third time.
 

 In no way is this mother like the mother in
 
 H.H.,
 
 whose drug problem had not been addressed by any attempts by DHR to rehabilitate her. The mother in
 
 H.H.
 
 had only been offered drug screens, visitation, and bus tickets to assist her with her transportation needs.
 
 Id.
 
 at 1106. DHR offered the mother in the present case actual drug treatment. Although the mother did not participate in the recommended inpatient treatment, she did seek and complete an outpatient-treatment program and engaged in long-term counseling to address her substance-abuse issues.
 

 As the main opinion in
 
 H.H.
 
 recognized, “ ‘[a]t some point, however, the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.’ ”
 
 Id.
 
 at 1105 n. 5. (quoting
 
 M.W. v. Houston County Dep’t of Human Res.,
 
 773 So.2d 484, 487 (Ala.Civ.App.2000)). This case is rather like
 
 D.G. v. State Department of Human Resources,
 
 569 So.2d 400 (Ala.Civ.App.1990), in which the mother’s two children had been in and out of foster care over a five-year period. As aptly stated by this court, “[a]t some point it becomes necessary to say that the children require a more
 
 permanent
 
 placement.”
 
 D.G.,
 
 569 So.2d at 403. More recently, in
 
 M.A.J. v. S.F.,
 
 994 So.2d 280, 291 (Ala.Civ.App.2008), this court held that the 12-month period between foster-care placement and the 12-month permanency hearing required by former Ala.Code 1975, § 12-15-62(c), is sufficient time within which the parents may “prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved.” In
 
 M.A.J.,
 
 we further held that the circumstances of a particular case should dictate the length of the rehabilitation period allowed a particular parent.
 
 M.A.J.,
 
 994 So.2d at 291 (quoting
 
 Talladega County Dep’t of Human Res. v. M.E.P.,
 
 975 So.2d 370, 374 (Ala.Civ.App.2007)) (“ ‘[T]he point at which the child’s needs overcome the parent’s right to be rehabilitated must be determined based on the facts of each individual case.’ ”).
 

 DHR has expended much time and effort to rehabilitate the mother in the present case. We reject her characterization of DHR’s failure to resume efforts at rehabilitation that have proven futile as a failure to fulfill its statutory duty to make reasonable efforts to rehabilitate her and to reunify her family. As we have said before:
 

 “Based on these circumstances, the juvenile court reasonably could have con-
 
 *772
 
 eluded that an adequate amount of time and effort had been expended in an attempt to rehabilitate the mother but that further time and effort would not help achieve the goal of family reunification in light of the mother’s lack of progress over a [five]-year period. We note that the law speaks in terms of ‘reasonable’ efforts, not unlimited or even maximal efforts. In this case, DHR used reasonable efforts to rehabilitate the mother, and the juvenile court did not err in concluding that it would be unreasonable to prolong those efforts.”
 

 M.A.J.,
 
 994 So.2d at 292. Accordingly, we affirm the judgments terminating the parental rights of the mother.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
 

 [1]
 

 . R.R. was given placement of W.R., pending a determination of his paternity; because the mother was still married to R.A., the father of R.A.A. and A.A., at the time W.R. was born, R.A. is W.R.'s legal father.
 
 See
 
 Ala.Code 1975, § 26-17-5(a)(1) (stating that a man married to the mother at the time of a child’s birth is presumed to be the child’s father).
 

 [2]
 

 . The judgments also terminated the parental rights of each of the children's respective fathers, J.B. and R.A.; neither father appeals.
 

 [3]
 

 . In fact, at the time of the trial, the children had been in foster care a total of 42 months of the last 60 months. In the case of A.A., who was born in August 2002, he had been in foster care more than half of his life.