THOMAS, Judge.
 

 M.S. (“the mother”) appeals from a judgment terminating her parental rights to her son D.S. (“the child”). We affirm.
 

 The mother is 31 years old; by her own admission, she has been an alcoholic since the age of 16. She suffers from cirrhosis of the liver and paranoid schizophrenia. The Madison Juvenile Court had previously terminated her parental rights to another child. The child who is the subject of the present appeal was born on January 29, 2008. He was removed from the mother’s custody on February 8, 2008, when he was 10 days old, following a domestic-violence incident between the mother and her boyfriend. The mother does not know who the child’s father is. She stated that there were five men, known to her by their first names only, who could possibly be the child’s father.
 

 At the shelter-care hearing on February 8, 2008, the juvenile court determined that the child was dependent and awarded custody to the Department of Human Resources (“DHR”). Following the shelter-care hearing, DHR placed the child in foster care and developed an Individualized Service Plan (“I.S.P.”) for the mother. Despite the fact that it was not statutorily required to use reasonable efforts to rehabilitate the mother or to reunite her with the child,
 
 see
 
 § 12-15-65(m), Ala.Code 1975 (providing that “[rjeasonable efforts shall not be required to be made where the parental rights to a sibling have been involuntarily terminated”),
 
 [1]
 
 DHR assessed the mother’s needs and began providing services to her. DHR determined that the mother needed a substance-abuse-treatment assessment, a psychological evaluation, and parenting classes. It proposed to offer her those services plus bi-monthly supervised visitation with her child, transportation, random drug-and-alcohol screening, and parenting classes.
 

 The mother had a psychological evaluation on March 21, 2008, by Dr. Christine Lloyd, a clinical psychologist. Based on a personal interview with the mother, Dr. Lloyd determined that the mother was an alcoholic, that she had been diagnosed as suffering from cirrhosis of the liver and anemia, that she was receiving Supplemental Security Income (“S.S.I.”) as a consequence of being a “slow learner,” and that she was neither under a doctor’s care nor compliant with recommended medical treatments for her physical conditions. Dr. Lloyd testified that, at the time of her evaluation, the mother was incoherent and may have been under the influence of alcohol. Dr. Lloyd was, therefore, unable to make a definitive diagnosis of mental illness, but she noted that the mother’s psychological tests indicated that she had a “schizoid personality disorder, with paranoid personality features.” Dr. Lloyd recommended that the mother seek medical care for her physical problems and attend an inpatient treatment facility for alcoholism, after which, Dr. Lloyd said, the mother would benefit from psychological intervention and a follow-up psychological evaluation.
 

 
 *1243
 
 The mother had an alcohol-and-drug-treatment assessment that resulted in a recommendation that she enter a detoxification program immediately. The mother complied with that recommendation and participated in a three-day “detox” program from May 21 to May 24, 2008. In June 2008, the mother participated in group-therapy sessions at Bradford Health Services. DHR provided her with transportation to the sessions. On June 25, 2008, after the mother had attended six sessions at Bradford, the therapist recommended that the mother undergo residential treatment for her alcoholism. The mother refused to enroll in a residential program, and she did not participate in the Bradford group-therapy sessions after June 25. Meghan Nobriga, the mother’s caseworker at the Madison County DHR, testified that she did not hear from, and was unable to locate or contact, the mother from June 25 to September 2. On August 25, DHR filed a petition to terminate the mother’s parental rights.
 

 On September 2, 2008, the mother telephoned Nobriga to say that she had gone through another three-day detoxification program during which, she said, she had been advised to enroll in a residential alcohol-treatment facility. The mother told Nobriga that the program staff had located a facility for her but that she had chosen a different facility, Phoenix House in Tuscaloosa, and would be leaving soon. The mother was at Phoenix House from the middle of September until December 8, 2008. Nobriga received monthly reports from the Phoenix House staff concerning the mother’s progress. The reports indicated that the mother was complying with the program requirements, which, in addition to alcohol-dependency treatment, included G.E.D. classes, parenting classes, and Alcoholics Anonymous (“A.A.”) meetings. On three occasions, Nobriga transported the child to Tuscaloosa to visit the mother while she was in residence at Phoenix House.
 

 On December 1, 2008, the mother telephoned Nobriga to inform her that she had completed the Phoenix House program and would be coming home on December 3. Nobriga reminded the mother to provide DHR with her address and telephone number as soon as she returned home so that DHR could resume services to her. The mother did not contact Nobriga again until January 14, 2009.
 

 On that occasion, Nobriga informed the mother that she should have drug-and-alcohol screenings once per week; she told the mother that DHR would provide transportation to the screening site if she needed it. Between January 14 and March 6, 2009 — the date of the termination-of-parental-rights trial — the mother was scheduled for seven drug-and-alcohol-sereening tests; she failed to appear for five of them.
 

 At a scheduled court hearing on December 12, 2008, the mother’s attorney had requested that the mother be given a second psychological evaluation. Nobriga made an appointment for the mother with Dr. Lloyd on January 21, 2009; the mother failed to keep the appointment and failed to contact DHR and explain why she would not be there. Nobriga set up a second appointment for February 4, 2009; again, the mother failed to show up or to contact DHR. At trial, the mother testified that she had not received the notice of the first appointment that, Nobriga said, had been mailed to her brother’s address because, the mother explained, she was no longer living with her brother. The mother stated that she had missed the second appointment because she was “busy trying to obtain a residence.” The mother finally saw Dr. Lloyd for a second psychological evaluation on February 25, 2009, less than
 
 *1244
 
 two weeks before the hearing on the petition to terminate her parental rights.
 

 Dr. Lloyd testified that the mother had improved since her first evaluation almost a year earlier; she was coherent and she told Dr. Lloyd that she had conquered her alcohol problem. She stated that she had been “clean” on all her drug-and-alcohol tests. Dr. Lloyd was able to make a definite diagnosis regarding the mother’s psychological state. Based on the mother’s psychological tests and the mother’s history of having experienced auditory and visual hallucinations “all her life,” as well as other factors, Dr. Lloyd opined that the mother was suffering from paranoid schizophrenia. Dr. Lloyd also found that the mother had borderline mental retardation.
 

 Dr. Lloyd’s recommendations were: first, that the mother should be treated with psychotherapy and medication for paranoid schizophrenia; second, that the mother should participate in an outpatient recovery program for alcoholism, such as A.A., because of the high probability of relapse; and third, that the mother should attend parenting classes. Dr. Lloyd explained that, without treatment for her mental illness and alcoholism, the mother would not be able to parent the child and parenting classes would not be effective.
 

 The mother has not been employed for 10 years. Her sole source of income is S.S.I. benefits of approximately $650 per month. In the first juvenile proceeding with respect to this child, the court waived the mother’s child-support obligation. At
 
 the time of
 
 trial, the mother was living in a one-bedroom duplex and her rent payment was $469 per month. Nobriga’s testimony indicated that the mother has never had stable housing, that the mother had lived in 3 different places after returning from the Phoenix House program, and that, for approximately 4 of the 13 months that Nobriga was the mother’s caseworker, No-briga did not know where the mother was or how to reach her. When the termination-of-parental-rights petition was filed, Nobriga had not heard from the mother in two months.
 

 Nobriga testified that, although the mother was allowed supervised visitation with the child twice per month, she had actually visited the child only 9 times in 13 months, and 3 of those visits occurred because Nobriga brought the child to Tuscaloosa to see the mother. Nobriga stated that the mother loves the child and is appropriately attentive and caring during the visits. Nobriga acknowledged that, in the mother’s first I.S.P., DHR had identified parenting classes as a service that the mother needed and that DHR would offer her. She admitted that DHR had not provided parenting classes to the mother. Nobriga also conceded that the mother currently needed mental-health treatment and that DHR had never provided her with any mental-health services beyond evaluations, but, she said, DHR had focused first on treating the mother’s alcoholism, believing that until the mother’s substance-abuse issues were addressed, mental-health or parenting services “would not really benefit” the mother. Pointing out that, after completing the Phoenix House program, the mother had not attended A.A. or any other alcoholism support group and had not reported for five of seven scheduled drug-and-alcohol tests, Nobriga testified that she was not convinced that the mother had maintained her sobriety. Nobriga testified that several maternal relatives had appeared at the shelter-care hearing. She said that DHR had investigated those relatives and had found that none of them were suitable placement resources for the child.
 

 The mother testified that she had first rejected the suggestion that she undergo
 
 *1245
 
 residential treatment for her alcoholism because she did not think she needed it, but then, as she became sicker and sicker, she thought she would die if she did not get help, so she enrolled in and completed the Phoenix House program. Responding to a question about her five no-shows for drug-and-alcohol tests, the mother testified that she missed the tests because she had no transportation; she acknowledged that she could have received transportation services from DHR if she had contacted No-briga, which, she admitted, she did not do. The mother explained that, during the times she had not been in contact with Nobriga, she had “nowhere to live” and the places where she stayed did not have a telephone. In answer to a question about why she did not visit her child more than nine times in more than a year, she said that there was “no reason.” She testified, however, that she loved her child and would do “whatever it took” to get him back.
 

 In oral argument to the juvenile court at the conclusion of the testimony, DHR’s attorney emphasized the fact that it was not required to make reasonable efforts to rehabilitate the mother because the mother had previously had her rights to another child involuntarily terminated. In response, the mother’s attorney argued that DHR had never formally invoked § 12-15-65(m), the statutory provision exempting it from making reasonable efforts, and had never given the mother notice that it would rely on that Code section, but had, instead, provided the mother with rehabilitation services. The mother’s attorney maintained that once DHR had begun to make rehabilitation efforts, it was obligated to follow through with those efforts.
 

 The juvenile court entered a judgment determining that the mother had exercised only limited visitation with the child, that DHR had made reasonable efforts at reunification, that there were no less drastic alternatives to terminating the mother’s parental rights, that there were no suitable relative placements for the child, that the mother was “unable or unwilling to discharge her responsibilities to the child,” and that the mother’s “conduct and condition ... is such as to render [her] unable or unlikely to change in the foreseeable future.”
 

 On appeal, the mother argues (1) that DHR did not exhaust all reasonable efforts to rehabilitate her and to reunite her with the child, (2) that DHR did not present sufficient evidence of her current circumstances, and (3) that the juvenile court failed to consider all viable alternatives to the termination of her rights.
 

 Reasonable Efforts
 

 When required,
 
 DHR must establish by clear and convincing evidence that it has made reasonable efforts to reunite a child with his or her parents.
 
 See B.J.K.A. v. Cleburne County Dep’t of Human Res.,
 
 28 So.3d 765, 770 (Ala.Civ.App.2009) (stating that “[t]here is no question that DHR is required to exert reasonable efforts toward the reunification of a parent and his or her child, except in limited circumstances ....”). One of the circumstances exempting DHR from making reasonable efforts to reunite a parent with a child is present in this case. Section 12-15-65(m) provides that “[rjeasonable efforts shall not be required to be made where the parental rights to a sibling have been involuntarily terminated.” The juvenile court’s finding that DHR
 
 made
 
 reasonable efforts is surplusage because, not being a matter that DHR was required to prove, it was not necessary to the judgment.
 

 The Mother’s Current Circumstances
 

 The mother’s argument as to this issue is somewhat disjointed, but we dis
 
 *1246
 
 cern that she is contending that because her circumstances at the time of the termination hearing had improved somewhat over the circumstances that existed at the time DHR opened its case file on her, the termination of her parental rights was premature and she should be given additional time to improve her situation. Specifically, the mother points out that her completion of an inpatient alcohol-abuse program indicated her willingness and ability to do the things necessary to parent her child.
 

 The mother’s completion of the inpatient alcohol-abuse program indicates that she decided to comply in September with a recommendation that she had rejected over two months earlier — that she enter a residential treatment facility to address her alcohol-abuse problem. Given that DHR was not required to provide the mother with
 
 any
 
 rehabilitative services before moving to terminate her rights, the mother’s window for compliance with the recommendations made by DHR’s service providers, or for rehabilitating herself, was narrow indeed.
 
 Cf.
 
 § 12-15-65(n), Ala. Code 1975, which provides:
 

 “If reasonable efforts are not made with respect to a child as a result of a determination made by a court of competent jurisdiction in situations as described above [outlining aggravated circumstances under which reasonable efforts are not required], a permanency hearing, as provided in Section 12-15-62, shall be held for the child within 30 days after the determination. Reasonable efforts shall be made to place the child and to complete whatever steps are necessary to finalize the permanent placement of the child. Reasonable efforts to place a child for adoption or with a legal guardian or custodian may be made concurrently with other reasonable efforts.”
 

 Simply put, if the mother wanted to be reunited with her child, she did not have two months to waste. Moreover, while the mother’s completion of the Phoenix House program was commendable, it was only the first step on what, according to the evidence, was likely be a long path towards overcoming her alcohol dependency. The evidence indicated that the mother had not taken any further steps — such as participating in A.A. or showing up for substance-abuse testing that could have verified her claimed sobriety. Finally, even assuming that the mother had done everything that was necessary to overcome her alcohol dependency, she was, at the time of the termination hearing, unable to parent her child because of significant unaddressed mental-health issues — issues for which DHR was not required to assist her or to “give her more time.”
 

 In 1998, the Alabama Legislature, in response to the passage of the federal Adoption and Safe Families Act (“the ASFA”) — specifically, 42 U.S.C. § 671(a)(15)(D)(iii) — enacted § 12-15-65(m), which provides that reasonable efforts to preserve the family or to reunite a parent with his or her child are not required if the parental rights of the parent to a sibling of the child have been involuntarily terminated. In addition, § 12-15-65(m) lists four aggravated circumstances whose existence, if found by a “court of competent jurisdiction,” will exempt DHR from making reasonable efforts. Subsection (m) does not require that a prior involuntary termination of parental rights to another child be determined by a court of competent jurisdiction before DHR will be exempt from the reasonable-efforts requirement. For those aggravated circumstances that do require court determination, however, subsection (m) limits to 30 days the time after which a court’s determination that reasonable efforts are no longer required must be followed by a permanency hearing. Both provisions— one self-executing and one requiring judi
 
 *1247
 
 cial determination — were intended to accelerate the process by which a parent’s rights are terminated and a child’s need for permanency is realized. The purpose and scope of the ASFA were stated in the report of the House of Representatives’ Committee on Ways and Means to Congress:
 

 “The Committee bill is expected to increase the number of adoptions in the United States. Three major provisions of the bill were designed to produce this increase in adoptions. First, under current law, States must engage in ‘reasonable efforts’ to help families that have abused or neglected their children. Some observers have argued that uncertainty about the reasonable efforts standard sometimes delays State action in making children available for adoption. In response to this problem, the bill requires States to define ‘aggravated circumstances’ in State law, such as child torture or sexual abuse, that would permit the State to bypass the Federal reasonable efforts criterion and move expeditiously to terminate parental rights and make a child available for adoption. In addition, States would not be required to reunite families in cases where a parent has murdered another child or lost their parental rights to a sibling....
 

 “There seems to be almost universal agreement that adoption is preferable to foster care and that the nation’s children would be well served by a policy that increases adoption rates. Over the past several years, however, witnesses before the Committee have testified that there are a variety of barriers to adoption, some of them Federal. One barrier is the ‘reasonable efforts’ criterion in the Federal statute. This criterion requires States to make reasonable efforts to prevent removing a child from its home and to facilitate returning children to their homes if removal has been necessary. The intent of this policy is to provide services to families so that they can continue to fulfill their child rearing function.
 

 “However, there seems to be a growing belief that Federal statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents. As a result, too many children are subjected to long spells of foster care or are returned to families that reabuse them.
 

 “The bipartisan group that wrote this legislation recognized the importance and essential fairness of the reasonable efforts criterion. What is needed is not a wholesale reversal of reasonable efforts or of the view that government has a responsibility to help troubled families solve the problems that lead to child abuse or neglect. The Federal government now spends well over $4.5 billion dollars helping these families and their children.... Rather than abandoning the Federal policy of helping troubled families,
 
 what is needed is a measured response to allow States to adjust their statutes and practices so that in some circumstances States will be able to move more efficiently toward terminating parental rights and placing children for adoption.
 

 “Thus, the Committee bill would require States to define ‘aggravated circumstances,’ such as child torture, chronic abuse, or sexual abuse, in which States are allowed to bypass the Federal reasonable efforts criteria and instead would be required to make efforts to place the child for adoption.
 
 In addition, States would be required to bypass reasonable efforts to provide services to families if the parent
 
 has murdered a child, committed manslaughter in the
 
 *1248
 
 death of a child, or
 
 has another child for whom parental rights were involuntarily terminated.”
 

 H.R. Rep. 105-77, at 7-8 (1997),
 
 reprinted in
 
 1997 U.S.C.C.A.N. 2739, 2739-40 (emphasis added).
 
 See generally M.A.J. v. S.F.,
 
 994 So.2d 280 (Ala.Civ.App.2008) (holding that DHR properly ended reunification efforts after only eight months, when previous reunification efforts had failed and the record indicated that further efforts would be unavailing).
 

 Viable Alternatives
 

 The mother contends that the juvenile court erred by determining that there were no “less drastic alternatives to terminating [her] parental rights.” She maintains that an alternative not considered by the juvenile court was to provide her with the parenting classes that, DHR witnesses acknowledged, had been identified as a need for her, but had not been provided to her. That contention is another version of the “more-time-to-improve” argument that we have previously rejected. We reject it in this context for the' same reason: because DHR was not required to use reasonable efforts to rehabilitate the mother in order to reunite her with her child, the mother could be reunited with her child only if she rehabilitated herself — i.e., established that she was willing and
 
 currently
 
 able to parent her child — before DHR moved to terminate her rights. That did not occur in this case.
 

 The judgment of the Madison Juvenile Court is affirmed.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
 

 [1]
 

 . Section 12-15-65 was effective until January 1, 2009.
 
 See
 
 Act. No 2008-277, Ala. Acts 2008. Neither the mother nor DHR raises any issue with respect to the applicability of § 12-15-312(c), Ala.Code 1975, a part of the Alabama Juvenile Justice Act of 2008
 
 (see
 
 Act No. 2008-277, codified at Ala.Code 1975, § 12-15-101 et seq.), and we, therefore, assume without deciding that § 12-15-65(m) applies in this case.