THOMPSON, Presiding Judge, dissenting.
I would affirm the judgment entered by the Mobile Juvenile Court ("the juvenile court") that terminated the parental rights of H.B. ("the mother"). Therefore, I dissent.
The record indicates that the mother has a history of mental illness and that she was diagnosed at age 22 with psychosisschizophrenia. The mother was 37 years old at the time of the termination hearing, and the child was 9 years old. The mother is disabled as a result of her mental illness. She has resided for all of her life with her mother ("the maternal grandmother"). The mother testified that, except for the period during which she was pregnant with the child, she has taken Haldol to treat her mental illness; the mother insisted that she has always consistently taken that medication. I note, however, that other evidence in the record, discussed infra, indicates that there were periods in which the mother was not consistently taking the medications prescribed to treat her mental illness. The mother also testified that, since she was first diagnosed with her mental illness, she has sought treatment from an office or facility known as "Altapointe." The mother explained that she sees a counselor or psychiatrist once a year and that she goes to Altapointe for appointments concerning her medication every 90 days.
In August 2008, the Mobile County Department of Human Resources ("DHR") became involved with the mother. Natasha Dysert, a DHR social worker, testified that DHR was called because the mother was engaging in erratic behavior in the parking lot of the apartment complex in which she lived. Dysert stated that the mother was having a "mental-health crisis," and she explained that the mother had informed DHR social workers that she *885 had been shot in the head and that people were trying to run her over with a car. Dysert testified that drug paraphernalia was found in the mother's apartment. The child, who was then 18 months old, was found alone in the apartment in a high chair. Dysert testified that the mother was transferred to a hospital by ambulance and that she was not taking her medications for her mental-health condition at that time.
The mother disputed that she was acting erratically during that incident in 2008. The mother testified that she could not remember the exact details, but that she was either on her porch or in the apartment when DHR personnel, accompanied by law-enforcement officers, came and removed the child from her custody. The mother stated at the termination hearing that she did not know why DHR had removed the child from her custody in 2008, and she also testified that she believed that a disagreement with her neighbors was the reason for DHR's intervention at that time. DHR offered the mother services that included a psychological evaluation, parenting classes, and drug-screen tests. Custody of the child was returned to the mother in May 2010.
In 2012, DHR again took the child into protective custody after its social workers investigated a complaint from police concerning the condition of the mother and the maternal grandmother's apartment. At that time, the mother, the maternal grandmother, and the child resided in a one-bedroom apartment. Charlene Clemons, a DHR social worker, testified that the mother had 45 cats living in the apartment; the mother believed that there were 30 cats and a dog in the apartment at that time.[3] Clemons testified that the apartment was unfit for the child; she explained that the mother's apartment was dirty and that animal feces were all over the apartment. Clemons testified that she did not believe that the mother was taking her medications for the mental illness. DHR offered the mother, among other things, services "to get a psychological, to go to AltaPointe, and get back on her meds." The mother testified that animal control had removed all of the animals and that she had not had a pet since 2012. The child was returned to the mother's custody in December 2013.
The record indicates that in June 2015 DHR received a report that the mother's rental house had no working utilities and was unclean. Natasha Reyes, another DHR social worker, testified that she visited the mother's home during that time and that the child appeared to be in good physical condition. Reyes testified that the child usually appeared clean but that she had seen the child two or three times when she was not clean.
In late August 2015, the mother was arrested on a theft-of-property warrant. When law-enforcement officers arrested the mother, they contacted DHR because, according to Reyes, they found the house in "deplorable" condition. Reyes testified that the house was dirty and contained piles of trash, that there were numerous bugs in the house, and that the house had no operational utilities. The mother and the maternal grandmother admitted that they had lost water and power service to the house eight months earlier when the maternal grandmother had lost her employment, but they each testified that the *886 child had been fed and kept clean and that she had attended school each day.
The mother testified that the child was allergic to dust and that a doctor had diagnosed the child, who had symptoms of coughing and shortness of breath, with asthma ; a question was raised about whether the mother's smoking cigarettes in the home aggravated that condition. The mother testified that she took the child for a second opinion, and she stated she was told that the child did not have asthma but that the child should be checked again as she grew older.
In offering the mother reunification services in 2015, DHR asked the mother to complete another psychological evaluation; Reyes explained that that evaluation was to determine if the mother was experiencing another mental-illness incident and whether she needed treatment. DHR also offered the mother in-home services through "FOCUS," as well as parenting classes. Reyes testified that the mother did not take advantage of those services during the time she worked on the case. Reyes testified that the case was transferred to another worker immediately following a January 19, 2016, Individualized Service Plan ("ISP") meeting. Reyes testified that although the mother went to DHR's offices for that ISP meeting, the mother refused to go upstairs to an office to take part in the meeting because her attorney, although invited to the meeting, had not shown up to attend the meeting. During that January 19, 2016, ISP meeting, the permanency plan for the child was changed from "return to parent" to "adoption." Reyes testified that she showed the January 19, 2016, ISP to the mother, and it is undisputed that the mother signed that ISP document.
Sarah Jernigan, the DHR social worker assigned to the child's case on March 8, 2016, testified that in the time between Reyes's leaving the case and Jernigan's being assigned to it, Jernigan's supervisor had managed the child's case. Jernigan testified that when she was first assigned to the case, she had difficulty communicating with the mother because the mother did not return her telephone calls. However, at some point, the mother indicated her willingness to accept reunification services, and in May 2016 the mother submitted to the recommended psychological evaluation. By the time of the termination hearing, DHR had provided in-home parenting classes to the mother, who had taken part in one of those classes. Jernigan also asked the mother to submit to a hair-follicle drug test in the week before the termination hearing, but the mother had not gone to the appointment at the testing facility because, she said, she was ill. Jernigan testified that, although her job as a social worker in this case was to provide adoptive services for the child, she had worked with the mother to provide the reunification services even though the mother had rejected those services for the first nine months that the child was in foster care after her removal from the home in 2015. Jernigan stated that, at the time of the August 1, 2016, termination hearing, the mother was making progress toward the reunification goals.
Jernigan testified that, shortly before the termination hearing, the mother had progressed sufficiently to allow a one-hour visit with the child to occur in the mother's house. That visit occurred on July 19, 2016, and was supervised by the in-home services provider; Jernigan stated that the in-home visit had gone well. However, the mother had not had additional in-home visits with the child, apparently because the termination hearing occurred so soon after that first in-home visit.
Veronica Davis, the psychologist who performed the mother's psychological examination, *887 testified before the juvenile court and submitted her report into evidence. However, the juvenile court stated during the hearing that it would not consider Davis's report because Davis had referred to tests and evaluations performed during the examination but had not included the results of those tests and evaluations in her report.[4] The majority opinion states that, in explaining comments in her report that was later excluded from evidence by the juvenile court, Davis stated that "the mother was 'stabilized' at the meeting [she and Davis] had had on May 18, 2016." 236 So.3d at 880. I question whether this court should rely on Davis's testimony because it was largely based upon the report that the juvenile court stated it would not consider or afford any weight. However, I point out that Davis explained that she had concerns about the mother's stability because Davis had not been provided any information about the mother's treatment at Altapointe and because the mother had missed, but had failed to reschedule, a recent, May 2016, appointment at Altapointe and that Davis qualified her statement that the mother was "stabilized" by explaining that the mother "appeared to be stable in that moment in time" and that she was "stabilized in that session."
The mother challenges the evidence supporting the termination judgment. Specifically, the mother argues that the evidence does not support a determination that DHR made reasonable efforts to reunite the mother with the child.
"Whether DHR has made reasonable efforts to reunite a parent and a child is a fact-dependent inquiry. J.B. v. Jefferson Cnty. Dep't of Human Res., 869 So.2d 475, 482 (Ala. Civ. App. 2003). '[T]he efforts actually required by DHR in each case, whether the court is considering rehabilitation or reunification, depend on the particular facts of that case, the statutory obligations regarding family reunification, and the best interests of the child.' J.B., 869 So.2d at 482."
A.M.F. v. Tuscaloosa Cty. Dep't of Human Res., 75 So.3d 1206, 1210 (Ala. Civ. App. 2011).
DHR has removed the child from the mother's custody on three occasions. In B.J.K.A. v. Cleburne County Department of Human Resources, 28 So.3d 765 (Ala. Civ. App. 2009), a mother had lost custody of her children to the Cleburne County DHR for a third time, and the Cleburne County DHR did not make any further attempt to provide reunification services. The juvenile court in that case entered a judgment terminating the parental rights of the mother in that case, and this court affirmed, concluding that the Cleburne County DHR had complied with the requirements of Alabama law in providing its earlier attempts at reunification.
"We reject [the mother's] characterization of DHR's failure to resume efforts at rehabilitation that have proven futile as a failure to fulfill its statutory duty to make reasonable efforts to rehabilitate her and to reunify her family. As we have said before:
*888 " 'Based on these circumstances, the juvenile court reasonably could have concluded that an adequate amount of time and effort had been expended in an attempt to rehabilitate the mother but that further time and effort would not help achieve the goal of family reunification in light of the mother's lack of progress over a [five]-year period. We note that the law speaks in terms of "reasonable" efforts, not unlimited or even maximal efforts. In this case, DHR used reasonable efforts to rehabilitate the mother, and the juvenile court did not err in concluding that it would be unreasonable to prolong those efforts.'
" M.A.J. [v. S.F. ], 994 So.2d [280,] 292 [ (Ala. Civ. App. 2008) ]."
B.J.K.A. v. Cleburne Cty. Dep't of Human Res., 28 So.3d at 771-72.
I believe that in this case, as in B.J.K.A., supra, the juvenile court could have reasonably concluded that DHR made reasonable efforts toward reuniting the mother and the child. In 2015, during the third time that the child was removed from the mother's custody, the mother made no efforts to accept DHR's offered reunification services until the child had been in foster care for nine months. The mother was informed in January 2016 that the permanency plan for the child had changed, and DHR filed its termination petition in February 2016. However, the mother did not begin to cooperate with reunification services until May 2016. I note that the record indicates that the child was transferred to live with a potential adoptive resource in May 2016.
I further note that the mother had begun to take part in reunification services at the time of the termination hearing, but had not completed those services.[5] The fact that the mother's participation in the earlier reunification process did not enable her to maintain custody of her child, together with the mother's failure to cooperate with DHR's services for so long in this case, supports the conclusion that the juvenile court properly determined that DHR had provided appropriate reunification services and that further services would not have been successful in preventing the termination of the mother's parental rights. B.J.K.A., supra.
Also, there was evidence from which the juvenile court could reasonably question the mother's credibility. The mother testified that the child slept in a room away from the multitude of cats in her small apartment in 2012 and that she no longer had any pets after that incident. However, the juvenile court was not required to believe that the child was not affected by the filth in the apartment that caused DHR to remove her from the mother's custody. Further, Reyes testified that there was cat urine and feces in the family's rental house, and that that house was in an unsanitary condition, in 2015; that evidence indicates that the mother's testimony that she no longer had animals was not truthful. The mother testified that, with the exception of the period in which she was pregnant with the child, she had consistently taken her mental-health medications. However, that claim is also questionable given the evidence regarding the mother's behavior in 2008 and Clemons's testimony that, in 2012, she did not believe that the mother was taking her prescribed medications.
"The juvenile court was in the best position to observe the witnesses while they *889 testified and to evaluate their demeanor and credibility. Hall v. Mazzone, 486 So.2d 408, 410 (Ala. 1986). 'Moreover, "[b]ecause the trial court has the advantage of observing the witnesses' demeanor and has a superior opportunity to assess their credibility, [an appellate court] cannot alter the trial court's judgment unless it is so unsupported by the evidence as to be clearly and palpably wrong." ' Ex parte Fann, 810 So.2d [631,] 636 [ (Ala. 2001) ] (quoting Ex parte D.W.W., 717 So.2d 793, 795 (Ala. 1998) )."
D.M. v. Walker Cty. Dep't of Human Res., 919 So.2d 1197, 1214 (Ala. Civ. App. 2005).
The juvenile court, which received ore tenus evidence and had the advantage of observing the demeanor of the mother and the other witnesses as they testified, could reasonably have determined that the mother's attempts to comply with the reunification goals were " 'late, incomplete and, therefore, unconvincing [ ] measures taken only in anticipation of the termination-of-parental-rights hearing.' " A.M.F., 75 So.3d at 1212 (quoting J.D. v. Cherokee Cty. Dep't of Human Res., 858 So.2d 274, 277 (Ala. Civ. App. 2003) ).
The majority opinion concludes that the evidence does not indicate that the child suffered harm from the mother's conduct. I note, first, that there is no statutory requirement that, in a termination-of-parental-rights case, DHR prove that a parent's conduct has harmed a child, and I question whether the majority opinion might be interpreted in the future as adding an additional requirement of demonstrable harm that is different from the factors set forth by our legislature in § 12-15-319, Ala. Code 1975, for a juvenile court to consider in an action involving the termination of parental rights. I note that this court has reviewed cases in which a child has been removed from a parent's custody because of issues such as a parent's drug use and that we have not required DHR or a juvenile court to wait to intervene until harm to a child has occurred or been demonstrated. DHR and the courts may, and have a duty to, seek to protect children from the serious potential for harm and to act to protect the best interests of children; I believe that, in most circumstances, DHR and the courts may act to prevent harm to a child.
I further note that I disagree with the conclusion that there has been no harm demonstrated in this case. At the time the child in this case was taken into foster care for the third time in August 2015, the child was 8 years old and had already spent a total of 40 months, or more than 3 years of her life, in foster care. At the time of August 1, 2016, termination hearing, the child was 9 years old and had spent 52 months, or more than 4 years (i.e., almost half her life) in foster care. The evidence supports a conclusion that, in 2008, the mother's erratic behavior left her unable to properly supervise the young child. The maternal grandmother, with whom the mother and the child resided, had not intervened to protect the child from the filth found repeatedly in the family's home environment. In spite of the mother's testimony that the family no longer had animals after the child had been removed from her custody in 2012, cat feces were listed as a part of the detritus that rendered the mother's house unsanitary in 2015, when the child was again taken into protective custody.
Given the facts, the applicable caselaw, and the presumption in favor of the juvenile court's judgment afforded after the juvenile court has had the advantage of receiving ore tenus evidence, I cannot agree with the majority that the mother has demonstrated that the juvenile court *890 erred in determining that DHR had made reasonable efforts toward reunification.
The mother has not argued on appeal that the juvenile court erred in determining that there were no viable alternatives to the termination of her parental rights; accordingly, any such argument is waived. Ex parte Riley, 464 So.2d 92 (Ala. 1985). I note that the only relative identified as a possible relative resource by the mother or DHR was the maternal grandmother, with whom the mother and child have lived on all three occasions when the child was removed from the mother's custody.
I further conclude that the mother has failed to demonstrate error with regard to the other issues raised in her appeal. I would affirm the judgment of the juvenile court. Accordingly, I dissent.
Thomas, J., concurs.

Several witnesses testified regarding the animals in the mother's apartment. Clemons said there were 45 cats, and the mother said there were 30 cats. The maternal grandmother testified that 28 cats were listed on a piece of paper provided to her at the time by animal-control officials.

In explaining its reasons for not considering Davis's report, the juvenile court stated:
"THE COURT: ... But I'm going to tell you right now, I'm going to give [Davis's report] no weight whatsoever. I don't consider her to have done anything other than get the mother to report something and spit it back. She didn't make any kind of an expert evaluation or-whether or not she's qualified to do a psychological evaluation, I don't even know. But she didn't do one, and the report she's given does not include anything about the test instruments she used. She explains to have used three different tools, and there's nothing in here about what the tools said. I mean, I've never seen a psychological report that is like this, so I'm giving it no weight."

The mother testified that the in-home services provider had visited her home once and that, although she had completed the parenting classes, DHR or the in-home services provider "need[s] to watch to see if I am utilizing the-the tools that they've taught me."