Rel: December 13, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

### CL-2023-0899

_____

### P.R.P.

### v.

### Marshall County Department of Human Resources

### Appeal from Marshall Juvenile Court
### (JU-19-739.02)

MOORE, Presiding Judge.

P.R.P. ("the mother") appeals from a judgment entered by the Marshall Juvenile Court ("the juvenile court") terminating her parental rights to J.A.J.-R. ("the child"). We reverse the judgment and remand the case for further proceedings.

Background

The mother is a Guatemalan citizen; she gave birth to the child out of wedlock on September 20, 2014. In early 2019, with the agreement of the mother, the mother's "partner" F.M. ("the father") illegally migrated to the United States with the child. In March 2019, the father and the child settled in Marshall County, while the mother remained in Guatemala. On July 18, 2019, the father was arrested and charged with a sexual offense against the child, and the Marshall County Department of Human Resources ("DHR") took the child into protective custody. The juvenile court subsequently adjudicated the child to be a dependent child and placed the child into foster care. DHR did not contact the mother to inform her of those developments.

On June 22, 2020, still without having contacted the mother, DHR filed a petition to terminate the parental rights of the mother and of the father to the child.[1] The juvenile court ordered that the petition be served on the mother by publication in a Guatemalan newspaper. On July 7,

_____

[1]The juvenile court had subject-matter jurisdiction over the case pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, Ala. Code 1975, § 30-3B-101 et seq., particularly Ala. Code 1975, § 30-3B-201(a)(2).

2

2021, the juvenile court conducted a trial on the termination-of-parental-rights petition in the absence of the mother, and, on July 12, 2021, the juvenile court entered a judgment purporting to terminate the parental rights of the mother and the father. On November 11, 2021, the mother filed a motion for relief from the judgment insofar as it terminated her parental rights, which the juvenile court granted on January 19, 2022. On March 4, 2022, the mother filed an answer to the petition to terminate her parental rights.[2] Following an amendment to the petition, and the filing of an amended answer, the case proceeded to trial on May 17 and 18, 2023, and August 31, 2023.

---

[2]This court has determined that the juvenile court acquired personal jurisdiction over the mother. Although the mother was not served in accordance with the Inter-American Convention on Letters Rogatory and Additional Protocol, Jan. 30, 1975, 28 U.S.C. § 1781, service under the terms of that treaty is not mandatory nor exclusive. See Alvarado-Fernandez v. Mazoff, 151 So. 3d 8, 14 (Fla. Dist. Ct. App. 2014). DHR attempted service by publication pursuant to Ala. Code 1975, § 12-15-318; even if the service did not strictly comply with § 12-15-318, after the mother obtained relief from the original judgment terminating her parental rights, she filed an answer without raising any defense as to insufficient service of process, and the mother generally appeared in the case, thereby waiving any objection to personal jurisdiction. See R.M. v. Elmore Cnty. Dep't of Hum. Res., 75 So. 3d 1195, 1200 (Ala. Civ. App. 2011).

On December 4, 2023, the juvenile court entered a judgment terminating the parental rights of the mother, finding, among other things, that the mother had abandoned the child by allowing the child to illegally immigrate to the United States and that "the distance between ... DHR and the mother as well as the language barrier make any efforts or services, much less reasonable efforts, leading toward the rehabilitation of the mother impossible and therefore failed." On December 16, 2023, the mother filed a postjudgment motion to alter, amend, or vacate the judgment, or, in the alternative, for a new trial. On December 18, 2023, the mother filed a notice of appeal. On December 31, 2023, the juvenile court denied the mother's postjudgment ,motion and the appeal ripened.

Issues

The mother raises multiple issues on appeal, but we find the dispositive issue to be whether sufficient evidence sustains the findings regarding abandonment and reasonable efforts.

Standard of Review

A judgment terminating parental rights must be supported by clear and convincing evidence, which is "'"[e]vidence that, when weighed

against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly ... establish the fact sought to be proved.'
>
> "KGS Steel[, Inc. v. McInish,] 47 So. 3d [749] at 761 [(Ala. Civ. App. 2006)].
>
> "... [F]or trial courts ruling ... in civil cases to which a clear-and-convincing-evidence standard of proof applies, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]' [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.' § 25-5-81(c)[, Ala. Code 1975]."

5

Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

## Analysis

The Alabama Juvenile Justice Act ("the AJJA"), Ala. Code 1975, § 12-15-101 et seq., establishes the following goal for juvenile courts:

> "To reunite a child with his or her parent or parents as quickly and as safely as possible when the child has been removed from the custody of his or her parent or parents unless reunification is judicially determined not to be in the best interests of the child."

§ 12-15-101(3). Pursuant to that goal, once a child has been removed from the family home, a juvenile court should immediately ascertain whether the child can be safely reunited with his or her parent or parents. If the juvenile court determines that it is not in the best interests of the child to reunite the parent or parents at that time and places the child

6

into the legal custody of the Alabama Department of Human Resources and into foster care, the juvenile court must, within 60 days, find that "reasonable efforts" have been made to "make it possible for a child to return safely to the home of the child," Ala. Code 1975, § 12-15-312(b), or that such reasonable efforts are not required to be made. § 12-15-312(a)(2).[3]

In this case, on July 18, 2019, DHR, on an emergency basis, summarily removed the child from the home he was sharing with his father to protect the child from sexual abuse. On July 19, 2019, the juvenile court entered a shelter-care order awarding DHR, who had already placed the child into foster care, legal custody of the child. Because the father had been credibly accused of molesting the child and was in jail, the child could not be quickly and safely returned to his custody. However, as Christy Smith, a DHR social worker, testified, even in cases of parental abuse, a child can be reunited with the other, nonoffending parent. See generally L.M. v. Shelby Cnty. Dep't of Hum. Res., 86 So. 3d 377 (Ala. Civ. App. 2011). Accordingly, the mother

---

[3]The record contains no order finding that reasonable efforts were not required to be made.

7

contends that DHR had a duty to use reasonable efforts to reunite her with the child.

DHR counters that, because the mother abandoned the child, reasonable family-reunification efforts were not required. See Ala. Code 1975, § 12-15-312(c)(1) (providing that reasonable efforts are not required when a parent has subjected a child to abandonment); Ala. Code 1975, § 12-15-319(a)(1) (providing that, when a parent has abandoned a child, "proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents"). The AJJA defines "abandonment" as:

> "A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

Ala. Code 1975, § 12-15-301(1). In the judgment, the juvenile court specifically found that the mother had abandoned the child by allowing the child to illegally immigrate to the United States without any reasonable expectation that the family would be reunited, thereby voluntarily and intentionally relinquishing custody of the child to the

8

father and, without good cause or excuse, depriving the child of her parental care and affection.

The undisputed evidence in the case shows that the mother voluntarily agreed to allow the child to immigrate to the United States without her. The mother testified that she and the father had mutually decided that the father should take the child with him so that the child could be educated in an American school while the father worked to earn enough money to build a house. The mother testified that, if the plan succeeded, she would join the father and the child, leaving the mother and the father's two younger children to be raised by relatives in Guatemala, and that, if not, the father and the child would return to the village where the mother and the two younger children resided. The mother understood that the father and the child could be gone for an indefinite period, even as long as four years. The child's paternal grandfather purchased a cellular telephone for the mother so that she could maintain communication with the father and the child in the meantime. For several months, the mother used the cell phone to talk with the father and the child, until the cell phone was confiscated by DHR

9

on July 18, 2019, at which point she lost her sole means of communicating with the child.

This court has recognized that an illegal immigrant does not necessarily abandon a child by returning to his or her home country for a prolonged period to obtain a visa, see J.B. v. DeKalb Cnty. Dep't Hum. Res., 12 So. 3d 100 (Ala. Civ. App. 2008) (plurality opinion), or by being deported and becoming unable to personally care for a child. See V.G.J. v. Tuscaloosa Cnty. Dep't of Hum. Res., 368 So. 3d 886 (Ala. Civ. App. 2022). This court has not, however, specifically addressed whether a parent from another country abandons a child by allowing the child to illegally immigrate with another parent to this country. Like in all cases of abandonment, that depends on the intention of the parent, see Jefferson Cnty. Dep't of Hum. Res. v. S.W., 324 So. 3d 1240, 1257 (Ala. Civ. App. 2020) (holding, in pertinent part, that a "finding of abandonment requires evidence of intention"), and the justification for the parent's actions. See C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015) ("[A] juvenile court may premise a finding of abandonment only upon evidence indicating that a parent voluntarily, intentionally, and

unjustifiably committed the actions or omissions set out in § 12-15-301, Ala. Code 1975.").

In this case, the mother concedes that she freely chose to allow the child to migrate to the United States in the company of the father; undisputedly, however, the mother made that decision to afford the child a better standard of living. See D.C. v. A.B.C., 417 N.J. Super. 41, 48, 8 A.3d 260, 264 (Ch. Div. 2010) (holding that Guatemalan mother, who paid "coyotes" to smuggle minor across border so that he could thrive while residing with his father who was already in the United States, could not be said to have abandoned minor). No evidence shows that the mother intended to voluntarily relinquish her custodial rights to the child. See Ex parte D.J., 645 So. 2d 303, 306 (Ala. 1994) (defining "voluntary relinquishment" to include a surrender of custodial rights). The mother and the father contemplated that the mother would remain in communication with the child -- which she did -- and that they would all be reunited at some point, depending on the father's economic fortunes. Contrary to the juvenile court's findings, when the mother decided to allow the child to migrate to the United States, the mother did have a reasonable expectation that she and the child would be reunited.

11

Although the mother indicated that she had known that it may take four years or more before she was reunited with the child, this court has explicitly rejected a "rule that would equate any indefinite prolonged absence with abandonment." J.B., 12 So. 3d at 111 n.16 (plurality opinion). We, thus, reject the juvenile court's finding that the mother abandoned the child by letting the child relocate to the United States with the father.[4]

In the absence of the mother's abandonment of the child, DHR had a duty to use reasonable efforts to reunite the child with the mother. The AJJA contains no provision exempting DHR from discharging that duty when the parent does not speak English. The reasonableness of the efforts used by DHR to reunite a family depends on the unique needs of

---

[4]In arguing in support of the abandonment finding, DHR notes that, after DHR assumed custody of the child on July 18, 2019, the mother lost contact with the child; however, the juvenile court premised its abandonment finding solely on the mother's allowing the child to migrate to the United States. When setting aside the original judgment terminating the mother's parental rights, the juvenile court, referring to the period after DHR took custody of the child, found that the mother "appears to have taken reasonable steps, under the circumstances, to determine what circumstances her child was in and who was caring for her child." Thus, we do not address any alleged implied finding that the mother abandoned the child after July 18, 2019.

each family, including any special accommodations the family may require due to language barriers. See In re J.P., 14 Cal. App. 5th 616, 625, 221 Cal. Rptr. 3d 748, 755 (2017); Pravat P. v. Department of Health & Soc. Servs., 249 P.3d 264, 268-271 (Alaska 2011); In re Sorin P., 58 A.D.3d 743, 873 N.Y.S.2d 89 (N.Y. App. Div. 2009); In re Abraham C., 55 A.D.3d 1442, 865 N.Y.S.2d 820 (N.Y. App. Div. 2008); State of New Mexico ex rel. Children, Youth & Families Dep't v. William M., 161 P.3d 262 (N.M. Ct. App. 2007); In re Lopez, 166 Ohio App.3d 688, 703, 852 N.E.2d 1266 (2006). Likewise, the obligation to exert reasonable efforts toward reunification equally applies with respect to parents who reside in foreign countries. See Matter of A.M.C.-R., 306 Or. App. 360, 367, 473 P.3d 1167, 1170 (2020). A child-welfare agency making a fair and serious attempt to reunify a family should use all feasible means available to provide appropriate services to a foreign parent to achieve its goal. See In re Oreoluwa O., 321 Conn. 523, 542, 139 A.3d 674, 685 (2016).

In this case, the record does not support a finding that language barriers and distance made it impossible to reunite the mother with the child. The mother spoke only Aketeko, a Mayan dialect. Lindsey McKee,

13

a child-abuse and neglect investigator, testified that DHR had access to a "state language line," which McKee described as

> "the [Alabama Department of Human Resources]'s contracted line for language services and they offer language services of all kinds. They have dialects; they have Spanish and English; and such and so forth, and then you call it, and you have to give them your State i.d. number and then they assist you with an interpreter 24/7."

On July 18, 2019, McKee used that service to communicate with the father, who spoke Q'anjob'al, another Mayan dialect. Teresa Wilson, another DHR social worker, testified that she had also used that service to communicate with the father when he was in jail. No one testified that DHR did not have access to Aketeko interpreters who could adequately assist the mother with family-reunification services; in fact, DHR arranged for an Aketeko interpreter to facilitate virtual visitations between the mother and the child in 2022 and 2023.

Reasonable efforts at family reunification also were not impeded because the mother resided in a small village in Guatemala. DHR arranged visitations between the mother and the child, who was residing in Morgan County, and individual therapy by a counselor, who was also located in Alabama, through videoconferencing; the mother testified that

14

she had traveled two hours from her home to access a computer to attend the visits and the counseling sessions. According to a DHR witness, the mother had missed only two visits due to religious considerations and, she said, the mother had faithfully attended her therapy sessions until the therapist retired. DHR arranged a home study through International Social Services ("ISS") that was completed in October 2022.[5] The record contains no evidence indicating that DHR was unable to implement a vital service to achieve family reunification because of the mother's remoteness.

On the other hand, the record does support the mother's contention that DHR failed to promptly undertake reasonable efforts to reunite her with the child.

> "Once [the Department of Human Resources] places a child in foster care, it has an immediate duty to use reasonable efforts to reunite the family, absent aggravating circumstances. See Ala. Code 1975, § 12-15-312. That duty requires [the Department of Human Resources] to identify the circumstances that led to removal of the child, to develop a plan to ameliorate those circumstances, and to use reasonable efforts to achieve that plan. See Montgomery Cty. Dep't of

---

[5]ISS offers assistance with locating and providing services to parents abroad. As of the date of this decision, the relevant Web page could be found at: https://www.iss-usa.org/our-services/services-for-children/.

15

Human Res. v. A.S.N., 206 So. 3d 661, 672 (Ala. Civ. App. 2016) (citing H.H. v. Baldwin Cty. Dep't of Human Res., 989 So. 2d 1094, 1105 (Ala. Civ. App. 2007) (opinion on return to remand) (authored by Moore, J., with two judges concurring in the result))."

H.B. v. Mobile Cnty. Dep't of Hum. Res., 236 So. 3d 875, 882 (Ala. Civ. App. 2017).  In this case, DHR did not commence any efforts to reunite the mother with the child until July 6, 2022, almost three years after the child entered foster care.

The evidence in the record shows that, when the child was summarily removed from the father's custody on July 18, 2019, DHR did not know where the mother was.  DHR interviewed the father, but he did not provide DHR the mother's exact address.  McKee talked with two relatives of the child, who also failed to give her the mother's contact information.  DHR understood that the mother was residing somewhere in Guatemala.  DHR was obligated to use due diligence to locate the mother.  Due diligence

> "'"'denotes a thorough, systematic investigation and an inquiry conducted in good faith.' It includes searching not only 'standard avenues available to help locate a missing parent,' but '"specific ones most likely under the unique facts known to the [agency], to yield [a parent's] address."'"'"

16

In re J.R., 82 Cal. App. 5th 569, 588, 298 Cal. Rptr. 3d 500, 517 (2022) (citations omitted).  DHR did not use reasonably diligent efforts to locate the mother.

When DHR summarily removed the child on July 18, 2019, the child had a cell phone that he used to communicate with the mother.  DHR confiscated the cell phone, but it did not use the cell phone to obtain the mother's cellular telephone number or to try to call her.  DHR allowed the cell phone to power down and to lock without obtaining the cell phone's passcode.  Although policy required DHR to contact the Guatemalan Consulate to notify Guatemalan authorities that the child had been taken into protective custody, DHR did not send the consulate a letter until September 23, 2019, and, even then, DHR did not request the mother's contact information.  DHR also did not ask the consulate to provide the mother's cellphone number to it, even after one of its employees indicated that she had talked to the mother over the telephone.[6] DHR also did not contact ISS between 2019 and 2022, despite its policy to do so when a child can be placed in a foreign country.  When

_____

[6]DHR sent a request for the mother's contact information to the consulate on May 26, 2020, but the consulate did not respond.

United States Immigration and Customs Enforcement informed DHR in January 2021 that it was deporting the father, DHR did not follow up to request assistance with locating the mother.

After failing to obtain the mother's contact information, and, thus, failing to use any efforts to reunite her with the child, DHR filed the petition to terminate the mother's parental rights; however, DHR did not serve the mother with the petition. On March 5, 2021, almost nine months after the petition was filed, the juvenile court instructed DHR to "make all active efforts to locate" the mother and to report on those efforts. DHR never filed a report; instead, DHR moved to serve the mother by publication, which the juvenile court allowed. In April 2021, DHR published a notice of the termination proceedings, written entirely in English, in a Guatemala City newspaper. The mother, who is illiterate, did not receive actual notice of the termination proceedings through the publication.

Meanwhile, the father, who had pleaded guilty to assault in the third degree regarding the July 18, 2019, incident, and who had been deported back to Guatemala in early 2021, returned to the mother's village. Distraught that the child was not with him, the mother enlisted

his assistance in locating the child. They forwarded legal documents in the father's possession to a Guatemala City attorney, who, in turn, contacted Dr. Glykeria Teji, an attorney in the United States. Dr. Teji tried to locate the child through the Office of Refugee Resettlement, a part of the United States Department of Health and Human Services, without success. Dr. Teji also contacted the office of the child's guardian ad litem and the attorney for DHR to obtain information as to the whereabouts of the child. Dr. Teji testified that she was unable to gather any information about the child through those channels, although it appears that she learned of the ongoing termination-of-parental-rights proceedings.

Eventually, the mother secured legal representation through the Southern Poverty Law Center, who first appeared for the mother in the underlying proceedings in November 2021. After successfully moving the juvenile court to set aside the original judgment terminating the mother's parental rights, the mother's counsel, over DHR's objection, obtained an order on April 1, 2022, allowing the mother to visit with the child and arranged an individualized-service-plan ("ISP") meeting for July 6, 2022 -- the first step that DHR took to comply with its reasonable-efforts

mandate. See <u>E.W. v. Jefferson Cnty. Dep't of Hum. Res.</u>, 872 So. 2d 167, 172 (Ala. Civ. App. 2003) (describing an ISP as the starting point in the family-reunification process). By that point, DHR had instituted a permanency plan calling for termination of parental rights with adoption by the child's foster parent, who had assumed care of the child on July 2, 2021.[7]

After meeting with the mother, DHR changed the permanency plan to include a "concurrent goal" of reuniting the child with her. Although the ISP is intended to inform a parent of the conduct, conditions, or circumstances that need to be corrected for a family to be reunited, <u>see</u> <u>E.W.</u>, <u>supra</u>, DHR did not present any evidence as to the barriers to reunification that it identified in the ISP.[8] A DHR social worker testified

---

[7]Due to being raised by foster parents in Alabama for close to three years, the child no longer spoke Aketeko, and he referred to himself by an American name. The mother called an expert witness, who testified that DHR had not used best practices to promptly notify the mother of the juvenile proceedings, to initiate family reunification efforts, and to preserve the cultural identity of the child.

[8]DHR did not request that the mother pay child support or fault her for failing to obtain employment to financially support the child. The juvenile court nevertheless noted that the mother had not paid child support for the benefit of the child after he and the father migrated to Alabama. Section 12-15-319(a)(9) provides that, in termination-of-

that she wanted the mother and the child to attend individual therapy and family therapy, but it appears that the therapy was designed solely to ease the process of renewing the mother-child relationship. The mother accomplished all the goals established by DHR.

At trial, however, DHR social workers criticized the mother for failing to separate from the father. After the father returned to Guatemala, the mother rekindled her relationship with him, and they conceived a fourth child. The mother testified that, within two weeks, she separated from the father and that she had maintained that separation to assure that she could regain custody of the child. However, DHR social workers testified that, during virtual visits, the mother had told the child that the father had been falsely accused of harming him and that she had indicated that one of the child's sisters had been staying with the father. The mother continued to reside on land owned by the father's family, and she remained partially dependent on financial

---

parental-rights proceedings, a juvenile court shall consider the "[f]ailure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child where the parent is able to do so." DHR presented no evidence indicating that the mother was able to provide material support for the child and that she had failed to do so.

support from the father. Some questioning suggested that the father may be staying in the mother's home because male clothes were kept there. The mother did not have a sufficient explanation of what she would do if the father came to the family home to interact with the child. Based on that evidence,[9] the juvenile court determined that the mother lacked appropriate protective capacity.[10]

As part of the reasonable-efforts mandate, before a juvenile court can terminate parental rights on the ground that the parent has not successfully rehabilitated, the juvenile court must first give the parent a fair opportunity to rectify the barrier to family reunification.

> "Our caselaw provides that DHR must identify the conduct that led to the removal of the child, explain the barriers it perceives as preventing a parent from obtaining custody of a child, communicate its concerns to the parent, formulate a plan reasonably designed to remove those

---

[9]The juvenile court also indicated that the mother lacked protective capacity because she allowed the child to travel through unsafe conditions to immigrate to the United States, but the record contains no evidence regarding how the father and the child traveled or any of the conditions they encountered.

[10]The juvenile court also criticized the living conditions in Guatemala as compared to those in Alabama. "[T]erminating the mother's parental rights requires more than proving that the custodians can provide a better home for the child than the mother ...." D.H.E. v. W.D., 330 So. 3d 506, 517 (Ala. Civ. App. 2020).

obstacles so as to allow for family reunification, and assess whether those barriers remain after reasonable rehabilitation efforts have been exhausted."

B.L., 324 So. 3d at 836. Before trial, DHR never identified the mother's alleged continuing relationship with the father as an impediment to her reunification with the child, nor did it establish any means by which the mother could strengthen her protective capacity, assure that the father would be restrained from the child, or verify his absence from the family home.

In H.H. v. Baldwin County Department of Human Resources, 989 So. 2d 1094 (Ala. Civ. App. 2007) (plurality opinion), this court held that, in the absence of aggravating circumstances, DHR must make "'a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights.'" 989 So. 2d at 1104 (quoting State ex rel. A.C., 97 P.3d 706, 712 (Utah Ct. App. 2006)). The court held:

> "The natural starting point in any fair and serious attempt to rehabilitate the parent and to reunite the parent with the child is identification of that characteristic, conduct, or circumstance that renders the parent unfit or unable to discharge his or her parental responsibilities to the child. Once DHR identifies the source of parental unfitness, the overarching goal of family reunification requires DHR to communicate its concerns to the parent and to develop a reasonable plan with the parent that is tailored toward the

particular problem(s) preventing the parent from assuming a proper parental role. DHR should use reasonable methods to achieve its plan of removing or reducing the identified obstacle(s) to family reunification 'as quickly and as safely as possible.' Ala. Code 1975, § 12-15-[312(b)]. Finally, at the termination of any rehabilitation process, DHR should determine the success of its efforts, using reasonable evaluation tools."

989 So. 2d at 1105 (plurality opinion) (footnote omitted). This framework has been cited in over a dozen cases and clearly and concisely apprises DHR of the nature of its duties to act promptly and reasonably to reunite families. See, e.g., K.H. v. Madison Cnty. Dep't of Hum. Res., 384 So. 3d 641, 657 (Ala. Civ. App. 2023); M.H. v. Madison Cnty. Dep't of Hum. Res., 375 So. 3d 1270, 1278 (Ala. Civ. App. 2022); J.C. v. Madison Cnty. Dep't of Hum. Res., 293 So. 3d 901, 910 (Ala. Civ. App. 2019); P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 798 (Ala. Civ. App. 2013). DHR did not act timely or reasonably to complete any of the necessary steps to assure reasonable efforts were expended before petitioning to terminate the mother's parental rights.

Conclusion

Although the language and geographical factors did not make using reasonable efforts impossible, the record is replete with evidence

24

indicating that DHR failed to use reasonable efforts to reunite the mother with the child. When DHR fails to use reasonable efforts, a judgment terminating parental rights must be reversed. See T.B. v. Jefferson Cnty. Dep't of Hum. Res., 369 So. 3d 158, 164 (Ala. Civ. App. 2022). Therefore, we reverse the judgment terminating the mother's parental rights, and we remand the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Edwards, Hanson, Fridy, and Lewis, JJ., concur.